**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Ernest VIDA, Defendant-Appellant.**

**No. 16537.**

United States Court of Appeals
Sixth Circuit.

Dec. 30, 1966.

Jerome Goldman, Goldman, Cole & Putnick, Cincinnati, Ohio, for appellant.

Paul J. Komives, Detroit, Mich. (Lawrence Gubow, U. S. Atty., Detroit, Mich., on the brief), for appellee.

Before WEICK, Chief Circuit Judge, O'SULLIVAN, Circuit Judge, and KALBFLEISCH, District Judge.

O'SULLIVAN, Circuit Judge.

Ernest Vida appeals from a judgment entered upon a jury verdict rendered in the United States District Court for the Eastern District of Michigan finding him, and others, guilty of bankruptcy fraud, as charged in two counts of a three-count indictment. The indictment, returned April 16, 1963, charged appellant and twenty-one others with conspiracy to violate 18 U.S.C.A. § 152 (count one); with concealment of assets of the Norm Wilson Auto Sales, in contemplation of the bankruptcy of that concern (count two); and with concealment of the assets of such concern from the officers of the bankruptcy court after the institution of bankruptcy proceedings (count three). All defendants who stood trial were acquitted of the conspiracy count, but the appellant, with others, was convicted of the substantive offenses charged in counts two and three.

The involved criminal enterprise was so artless that it is hard to understand how those who designed it and those who participated in it could believe it would succeed and go unpunished. A discount house was set up as the successor to, and under the name of, a prior business, Norm Wilson Auto Sales, which, at the beginning of the venture, had a passable Dun & Bradstreet rating. A broad variety of materials was then ordered from numerous suppliers and manufacturers. The first orders were paid for promptly to satisfy credit for later and

larger orders. When the goods from these purchases were received, they were quickly disposed of for cash, often at substantially less than wholesale cost. The promoters hoped in this manner to get as much money out of the business as quickly as possible and then let bankruptcy follow, leaving the creditors to bear the losses.

Handsome bargains were enjoyed by some of the customers whose payments provided funds to make the scheme work. It is surprising that so many were "let in" on the deal. A total of 23 were named in the conspiracy count. Of this company, two were not indicted and five pleaded guilty to the conspiracy count; sixteen were tried on all three counts, six to the District Judge and the remaining ten to a jury. The trial was a good deal more complicated than the involved plan. It lasted some six weeks and fourteen different lawyers represented the various defendants. Proofs for the consideration of the District Judge and the jury, as triers of the facts, were taken at the same time. Five of the defendants were acquitted by the District Judge, one by the jury; the other ten were all acquitted of the count one conspiracy charge, but found guilty of one or both of the substantive offenses.

Appellant Vida claims the trial judge erred in the following respects: 1) he failed, *sua sponte*, to order a severance as to Vida; 2) he failed to tell the jury that if they acquitted Vida of conspiracy, they should disregard evidence of out-of-court statements and conduct of alleged co-conspirators; 3) he failed to grant a new trial since, appellant charges, it would have been psychologically impossible for the jury to disregard testimony admitted under the conspiracy charges, even under a sufficient instruction; 4) he incorrectly conducted the trial on the assumption that there was only one conspiracy, whereas there were several conspiracies; 5) he provided inducement for certain codefendants who had pleaded guilty to testify as the government wished by withholding imposition of sentence; 6) he created the impression, by his manner of questioning, that he found a defense witness unreliable.

Appellant Vida does not argue that there was not sufficient evidence from which the trial judge and the jury could find him guilty beyond a reasonable doubt. He urges, rather, that the proportions of the trial, its complexities and length, and the use of the testimony of the admittedly guilty chief architects of the scheme—coupled with evidence of certain admissions by co-conspirators—deprived him of a fair trial. Most of these contentions now made on appeal, however, were not presented to the District Judge, except upon motion for new trial. It is not argued that Vida was denied his constitutional right to the effective assistance of an attorney. He was represented at the trial by counsel originally chosen by him, but who ultimately conducted the defense as appointed counsel. Vida's lawyer did not at any time request a separate trial for him.

Admittedly active in the total enterprise, Vida's claim of innocence was that he was a mere employee, a salaried salesman, and that some of his acquisitions of property delivered to Wilson Auto Sales were in lieu of his salary.

Preliminarily, we observe that it is difficult to conceive of the innocence of anyone who was a close and active participant in the bold and quite observable "shenanigans" here involved. Between the time the business got under way in April, 1962, and the filing of an involuntary petition in bankruptcy for it on July 6, 1962, it generated some $370,-000 in claims filed against the bankrupt estate. We recite from the evidence the following which, if believed, disclosed in part the extent of Vida's participation.

In January of 1962, one Williamson, who ultimately pleaded guilty to the conspiracy charge, visited a business known as Giant Discount. There he met John Campbell (one of those who pleaded guilty) and appellant Vida. There were others there. Campbell was briefed on the business operation of the Giant Discount store. Such operation was ulti-

mately to form a rough blueprint for the activities leading to the present indictment.

Williamson contacted a Mr. Wilson, who owned and ran Norm Wilson Auto Sales, a business which had a reasonably good credit rating. After having the deal explained to him, Wilson stated that he wasn't interested in going bankrupt himself, but agreed to let his business be taken over for this purpose. A Mr. Lamb was induced to join the enterprise, have the business put in his name, and undergo bankruptcy. Organizational capital was supplied by a Mr. Redwitz, and it was initially agreed that profits would be divided equally among Williamson, Lamb, Wilson and Redwitz.

Shortly after this was arranged, Williamson, Campbell (who was using his experience with Giant Discount to help Williamson), appellant Vida, and Lamb found a building in Flint, Michigan, from which to run the operation. Campbell and Vida took an active part in setting up the business, with Vida taking a $200 a week job as a salesman. There was testimony that as various of the originators dropped out, Campbell, Williamson and Vida were ultimately splitting the profits among themselves.

The name of the business was changed from "Norm Wilson Auto Sales" to "Norm Wilson Sales" and the operation actually got under way in April, 1962, buying and selling at wholesale prices building and other materials including furnaces, furniture, radios, pleasure boats, power tools, power lawn mowers, and similar lines of merchandise. By June 8, 1962, a Dun & Bradstreet report was circulating which said in effect that "there apparently were more bad guys than good guys." Appellant knew of this report, but continued his active involvement in the business.

On July 6, 1962, an involuntary petition in bankruptcy was filed against Lamb as registered owner of the business, and also against several others, including appellant, as undisclosed partners. A receiver was appointed on July 9, 1962, and the business was adjudicated bankrupt on August 2, 1962.

On November 2, 1962, a substantial amount of merchandise was found stored at two locations, at a garage located in Highland Park, Michigan, which Vida had rented on July 4, 1962, and in a warehouse in Flint which Vida had rented in April under the fictitious name of Aaron Smith. Vida had not disclosed the existence of these goods during the bankruptcy hearing. There was further evidence that as late as July 6, 1962, the date the involuntary petition was filed, appellant took an order on a boat consigned to the bankrupt company and received over $1,000 cash for it.

On July 14, 1962, five days after the bankruptcy receiver locked up the business in the presence of appellant, appellant with Williamson, Wilson and Campbell, took delivery of a truckload of Dura Craft boats, one of which was towed to Rebel Discount store, which had been, and still was, being used as an outlet for merchandise. Another of the boats was sold the following day by Williamson, and a third was used by Vida to complete the transaction he had made on July 6.

There was evidence that sometime in June, 1962, an arrangement was made whereby the then contents of the Norm Wilson Enterprise building would be traded to customers for three new Cadillacs. This transaction was agreed to at a meeting at 10:00 o'clock at night while appellant Vida and others were loading trucks at the building. Apparently Vida was to receive one of the Cadillacs, but the transaction was not concluded. On another occasion when Vida and associates were dealing with a boat concern, Dura Craft, appellant Vida advised paying for the first delivery so they could establish credit for further purchases. Such purchases were made, and Vida acquired one boat for his own use. Vida, in an effort to have a large order of furnaces placed, advised letting a salesman think that Wilson Sales was supplying a large number of furnaces to Flint builders. Furnaces arrived and

it was decided to get rid of them quickly but, as the witness Williamson testified, "there was a slight argument about selling these furnaces so cheap and Mr. Vida told me that he didn't want to sell these furnaces this cheap, he would just as soon take his share and take them someplace, so the furnaces were split up equally" between Vida and two others. The witness said that Vida took his share from the Norm Wilson Sales premises.

There was evidence that after the receivership was instituted, Vida and others removed additional goods from the Norm Wilson Sales inventory. Vida picked up some seven boats along with various other items of merchandise. The business did not keep books and records and during July the money received for its stock was taken by Williamson, Campbell and appellant Vida. Williamson said he, himself, received $2,250 in that month. There was evidence that after the receiver had been appointed Vida and others were "short-cutting the business" by picking up goods that should have gone to the business.

There was other evidence identifying Vida with the enterprise, but the foregoing will illustrate the amplitude of the proofs from which the jury could find Vida a criminal participant. It is true that the larger part of the testimony came from witnesses who had turned "states evidence" or who had been named as conspirators and participants, but not indicted. The testimony, however, was in the main direct proof and not made up of admissions by co-conspirators. There was also substantial evidence from representatives of various companies who sold goods to Norm Wilson Sales, identifying Vida as an active participant in one or more of the involved transactions.

Appellant Vida took the stand in his defense. Under his own counsel's direct examination he disclosed that he had, in 1951 or 1952, been convicted of the crime of receiving stolen property and had been convicted in Canada of smuggling cigarettes. He gave testimony of his general background, including his combat service in World War II; he said he had

read the indictment and then his direct examination concluded with the answer, "No, sir, I am not," to the question, "Are you guilty of any of the charges made in that indictment?" He was then turned over for cross-examination. On cross-examination by government counsel, Vida testified to his acquaintance and association with one Donle prior to joining in the enterprise involved. Vida told of Donle trucking to the two warehouses which he, Vida, had rented—one under a fictitious name—one shipment including 20 to 30 furnaces, and another which included "six-unit heaters, 12-ton air conditioners and five 3-ton air conditioners." Vida expressed his belief that these shipments were taken directly from the trailers upon which they had arrived at the Norm Wilson Sales to Vida's rented warehouses without ever being placed in the Wilson Sales building. Goods in one of Vida's rented warehouses were found by the FBI upon execution of a search warrant, after the bankruptcy proceedings were pending. Vida had not made any prior disclosure of the location of this merchandise. Vida gave his explanation of these proven facts—its plausibility being for the jury's consideration.

Cross-examintion by the other defense counsel was limited to eliciting Vida's averment that his co-defendant Williamson's reputation for honesty among his employees was very bad. On redirect, he gave further explanation of the presence of merchandise in the two premises rented by him. Vida also offered some witnesses in defense who gave evidence supportive of his claim of innocence.

■ We have, at the foregoing length, set out testimony which could have permitted a jury to believe Vida guilty beyond a reasonable doubt—not, however, to evidence a like belief by us. With increasing emphasis, we are cautioned that the patent guilt of an accused is wholly immaterial to an appellate court's consideration of the adequacy of a trial court's protection of his constitutional rights. Cf. Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Miranda v. State of Arizona, 384 U.S.

436, 457, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). But here we are asked to reverse not because the District Judge erroneously ruled on any matters addressed to him during the trial, not because any particular rule of law was offended, not because Vida had less than the effective assistance of counsel, and not because there was less than ample evidence of his guilt. It is argued that upon our review and as a matter of taking notice of plain error, 52(b) F.R.Crim.P., we should conclude that Vida could have been, and undoubtedly was, prejudiced because of the size of the case, the quantity and quality of the evidence, the length of the trial and the number of defendants tried together. In resolving these questions we must, as we have done, take a look at the government's proofs to aid us in determining whether the total context of the prosecution denied him a fair trial.

### 1. Failure to order a severance.

Should we reverse because the District Judge did not, *sua sponte*, order a separate trial for Vida? We first observe that at this distance we cannot probe the mind of Vida's counsel to learn of the considerations which prompted his decision not to ask for a severance. But had he moved for one, disposition of his motion would have been within the discretion of the District Judge. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Sharp v. United States, 195 F.2d 997, 999 (CA 6, 1952); Bullock v. United States, 265 F.2d 683, 689 (CA 6, 1959), cert. den. 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed. 1260. A district judge has the power to order a severance under Rule 14, F.R. Crim.P., and indeed has a "continuing duty at all stages of the trial to grant a severance if prejudice does appear." Schaffer v. United States, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). We note that both the rule and the authority quoted use the word "grant" connoting a request for the trial judge's assistance. We however, do not support what was done on the basis of procedural nicety or by faulting Vida's

trial counsel for failure to ask for a severance. Had he so moved and been denied such relief, we would not find abuse of discretion, considering what the record had made known to us. We are aware of the Supreme Court's admonition in Kotteakos v. United States, 328 U.S. 750, 773, 66 S.Ct. 1239, 90 L.Ed. 1557, 1571 (1946), against endangering a man's defense by submerging it in a mass trial, but, obedient to such admonition, we are not persuaded that reversal is here called for. The government's brief avers that the record "fairly shrieks of guilt." Appellant's rejoinder agrees, but insists that such glaring guilt did not include Vida. We have not attempted exposition of all of the evidence of the guilt of those involved— the ones who pleaded guilty and those who were convicted—but we have recited proofs that disclose Vida's own activity in the overall operation. There was evidence that he was in on its beginning and stayed with it after bankruptcy and until the law interfered. It was not an abuse of discretion by the trial judge to tolerate the government's trying him with his associates, even if some of them had a larger share in its illegality.

It is argued that the fact that the jury acquitted all of those tried by it of the conspiracy count somehow demonstrated prejudice to Vida. At most, this may evidence inconsistency, which will not require reversal if there was evidence to sustain conviction of the substantive counts. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, 358, 359 (1932); United States v. DeLucia, 262 F.2d 610, 616 (CA 7, 1958), cert. den. 359 U.S. 1000, 79 S.Ct. 1136, 3 L.Ed.2d 1029.

While some of the evidence of Vida's alleged guilt came from admissions of alleged co-conspirators, for the most part it was made up of direct testimony which would be admissible upon a separate trial. That Vida was not swept into conviction by a finding of mass guilt is portrayed by the selective verdicts returned by the jury and the trial judge indicating discriminating

consideration of the evidence. After listening to the District Judge's careful admonishment:

"It is your duty to give separate, personal consideration to the case of each individual defendant. When you do so you should analyze what the evidence shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case determined from his own acts and statements and the other evidence in the case which may be applicable to him."

the jury acquitted one defendant on all counts, convicted three others on count two but acquitted them under count three, and convicted another on count three but acquitted him on count two. The District Judge directed the acquittal of five defendants and found three of those tried by him guilty on one or the other of the substantive counts.

■ Finally, appellant suggests that the dissenting opinion in Schaffer v. United States, 362 U.S. 511, 518, 80 S.Ct. 945, undoubtedly expresses what would be the Supreme Court's view today of the failure, even though not requested, to order a severance after the jury acquitted on the conspiracy count. At this point it will be sufficient to say that it is our duty to follow the majority opinions of the Supreme Court. We later discuss the *Schaffer* case.

### 2. Failure to give cautionary instruction.

■ Appellant urges that the District Judge should have told the jury with emphasis and particularity that if they acquitted Vida of the conspiracy count, they were to disregard evidence of admissions by alleged co-conspirators. The judge had advised the jury generally on the necessity of finding conspiracy in order to warrant the use of co-conspirators' admissions and said:

"Otherwise, any admission or incriminatory statement made outside of court by one person may not be con-

sidered as evidence against any person who was not present and heard the statement."

Such was the correct rule. Glasser v. United States, 315 U.S. 60, 74, 75, 62 S.Ct. 457, 86 L.Ed. 680, 701 (1942). But it has not been decided that having made a correct ruling on the initial admission of such evidence, the trial judge is required to instruct the jury as appellant now contends, Carbo v. United States, 314 F.2d 718, 735–738 (CA 9, 1963), cert. den. 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498, especially where, as here, he was not requested to do so. Rules 30 and 52 F.R.Crim.P.

Having in mind that the principal evidence against Vida was direct testimony, with a minimal amount of hearsay admissions that to a large extent were otherwise corroborated, we find without merit the charge of error in this regard.

### 3. Denial of new trial.

■ Appellant argues that because the jury acquitted all of the conspiracy count, Vida should have a new trial under counts two and three; this because the evidence admitted under the conspiracy count had been heard by the jury. We believe that what we have said above is sufficient answer to this question.

Reliance here, however, is again placed on the dissenting opinion in Schaffer v. United States, 362 U.S. 511, 518, 80 S.Ct. 945. We need not speculate as to whether such dissent expresses the majority view of the present court. The case is not in point. There an indictment consisted of four counts, generally dealing with the interstate transportation of stolen goods. The substantive counts each charged separate and distinct offenses, but with one group of defendants participating in each of the events. Each of the others charged were named in only one of the substantive counts. The fourth count charged conspiracy by all. The defendants who were charged in all counts pleaded guilty, and the others were brought to trial together. The trial judge dismissed the conspiracy count at

the close of the government's case, but continued the trial as to the substantive counts. The majority opinion held that no prejudice had been shown and affirmed the convictions against a claim made on appeal that separate trials should have been ordered after dismissal of the conspiracy count. In disagreement, the dissent emphasized that each of the defendants tried was named only in one count describing an offense wholly unconnected with those charged as committed at a different time and place and by a different person. The distinction from the case at bar is disclosed by the dissent's language:

"The evidence concerning these petitioners [the defendants who stood trial] was not in any proper sense of the words evidence concerning 'the same series of acts or transactions' constituting an offense.

\* \* \* \* \* \*

By a joint trial of such *separate offenses,* a subtle bond is likely to be created between the several defendants though *they have never met nor acted in unison;* prejudice within the meaning of Rule 14 is implicit." 362 U.S. at 522, 523, 80 S.Ct. at 951. (Emphasis supplied.)

The evidence here disclosed that Vida was an activist in a single enterprise well described by Judge Learned Hand as having a purpose

"to obtain supplies, make quick sales, collect the proceeds, and then allow the company to fall into bankruptcy, making off with such loot as might meanwhile have been gathered." Kaplan v. United States, 7 F.2d 594, 595 (CA 2, 1925), cert. den. 269 U.S. 582, 46 S.Ct. 107, 70 L.Ed. 423.

#### 4. Claim of several conspiracies.

Asserting that the transaction involved contained several separate conspiracies, appellant argues that the reception of evidence and the submission of the case to the jury upon a theory of one conspiracy prejudiced Vida. We consider that the evidence showed one broad and continuing endeavor to defraud cred-

itors by receiving and disposing of goods without paying for them and intentionally allowing the consequent bankruptcy. Individual defendants were entering and leaving the operation as it continued its course. See Poliafico v. United States, 237 F.2d 97 (CA 6, 1956), cert. den. 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597; Sigers v. United States, 321 F.2d 843, 846, 847 (CA 5, 1963); United States v. Rosenstein, 34 F.2d 630, 635 (CA 2, 1929), cert. den. 280 U.S. 581, 50 S.Ct. 33, 74 L.Ed. 631.

#### 5. Withholding sentence.

Conceding that there is no decisional law or published academic dissertation to support him, appellant asserts that use of testimony from defendants who had pleaded guilty but had not been sentenced was an evil practice, which should not have been tolerated. He equates the withholding of sentence with an inducement to the witnesses to perjure themselves or to give biased testimony in favor of the prosecution in the hope of reward by a lenient sentence. The relevant facts could of course have been emphasized on cross-examination and argued to the jury upon the question of such witnesses' credibility. Instruction could be requested on the same subject. See United States v. Rainone, 192 F.2d 860, 861 (CA 2, 1951).

We are not disposed to fashion a rule heretofore unknown in the jurisprudence of criminal prosecutions. Neither are we impressed that the use of the testimony of an unsentenced accomplice deprives one who stands trial of due process or fair treatment. See Lisenba v. People of State of California, 314 U.S. 219, 227, 62 S.Ct. 280, 86 L.Ed. 166, 175 (1941); Hoffa v. United States, 87 S.Ct. 408, Dec. 12, 1966; Diaz-Rosendo v. United States, 357 F.2d 124, 130 (CA 9, 1966); United States v. Kubacki, 237 F.Supp. 638, 643, 644 (D.C.E.D.Pa. 1965). We find no disagreement with the text that "the fact that a witness hopes or expects that he will secure a mitigation of his own punishment by testifying on behalf of the prosecution

does not disqualify him". 23 C.J.S. Criminal Law § 805, p. 70.

### 6. Trial judge's examination of defense witness.

One Hudson testified for defendant that some property alleged to have belonged to the bankrupt business, and which was found stored in one of appellant's two caches, had actually been bought by Hudson some two months before the receiver was appointed, but that he had allowed appellant to store it for several months after the bankruptcy.

After the completion of examination by the attorneys, the court inquired as to the value, price paid, and also as to possible records relating to the date of purchase of the property. This matter was of vital importance to Hudson's testimony, and the District Court's desire to have the matter more fully elaborated was within the proper scope of his function. See Lewis v. United States, 11 F.2d 745, 747 (CA 6, 1926); Knapp v. Kinsey, 232 F.2d 458, 466 (CA 6, 1956), cert. den. 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86; United States v. Lewis, 338 F.2d 137, 140 (CA 6, 1964), cert. den. 380 U.S. 978, 85 S.Ct. 1342, 14 L.Ed.2d 272. Nor did his attitude in questioning the witness take him outside the limits of permissibility as outlined in Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). The District Judge suggested that the witness consult his own and the bankruptcy court records to see if he could provide more informative answers to the court's questions. At the end of the examination, the judge told the witness that he was excused "subject to recall." He was not recalled and we do not consider that it was the judge's duty to recall him, there having been no request that he do so.

We wish to express our gratitude to Mr. Jerome Goldman, of the Cincinnati bar, for his exemplary discharge of his responsibilities as this Court's appointee to present defendant's appeal. His excellent and exhaustive brief and vigorous oral argument to this Court exhibited labor and advocacy in keeping with the highest traditions of the bar of this country.

Judgment affirmed.