**J. C. McDONALD, Petitioner-Appellee,**

v.

**George A. KROPP, Warden, State Prison of Southern Michigan, Respondent-Appellant.**

**No. 16742.**

United States Court of Appeals
Sixth Circuit.

Feb. 7, 1967.

---

Luke Quinn, Asst. Atty. Gen., Lansing, Mich., Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Lansing, Mich., on brief, for appellant.

Sherwin Tukel (Court Appointed), Detroit, Mich., for appellee.

Before O'SULLIVAN, Circuit Judge, CECIL, Senior Circuit Judge, and MATHES, Senior District Judge.

O'SULLIVAN, Circuit Judge.

We deal here with an order of a United States District Court directing the release from a Michigan State Penitentiary of appellee, J. C. McDonald who, in 1948, was there confined upon his plea of guilty to first degree murder. The District Judge concluded that the plea was involuntary. Petitioner has never denied, and has at all times admitted that in the predawn hours of January 8, 1948, he bludgeoned and fatally wounded a gas station owner who interrupted his burglarizing (breaking and entering) of a gas station. This, standing alone, may not be of controlling importance, but we consider that it is relevant to the credibility of McDonald and to the trustworthiness of his factual claims.

The order before us was entered upon a factual finding that McDonald's testi-

mony of coercion and persuasion, first told after he had been in jail for upwards of two years and had there "studied law," was to be believed as against denial by one of two accused Michigan officers of McDonald's claims that he had been threatened and assured that it was "fixed" so he would be "let loose" or "given probation" if he would plead guilty to first degree murder. The death of the other accused officer prior to any hearing on McDonald's charges foreclosed that officer's answering. The chiefly accused sheriff's officer and the judge of the Circuit Court of Muskegon County, Michigan, who accepted the plea of guilty, the Honorable Joseph F. Sanford, were deceased when the involved hearing was had in the District Court on June 11, 1965. Previous testimony, however, given by the officers in proceedings had in Michigan, as well as a full transcript of the Circuit Judge's inquiries into the voluntariness of petitioner's plea of guilty, were made a part of the District Court record.

A finding of inherent incredibility in petitioner's story, acceptance of the testimony of the deceased officers as true, or as valid the state Circuit Judge's determination (affirmed by the Supreme Court of Michigan) that the plea of guilty was voluntary, would have permitted denial of the petition for habeas corpus. The factual issue, however, was resolved in favor of the petitioner, primarily we believe, because of an imperfection which the District Judge found in the conduct of the state judge. The following are the facts which led to the finding of vitiating fault upon the part of the state judge.

Petitioner was arraigned before Judge Sanford on the morning of January 23, 1948, and being asked whether he would like to consult a lawyer before making a plea, stated that he wished to hire his own attorney. The judge asked no further questions, and adjourned the matter to allow petitioner to get a lawyer. Sometime in the afternoon of the same day, however, petitioner reappeared before Judge Sanford and announced that

he had changed his mind, did not wish an attorney, and desired to plead guilty to the murder. There followed an exhaustive inquiry by the judge, which we set out as Appendix A.

We fairly summarize this inquiry by saying that repetitiously, and with emphasis, the Circuit Judge told McDonald of his right to have an attorney to advise him before entering a plea, that such an attorney would be provided at the county's expense, that McDonald had a right to a jury trial or a trial without a jury, and that the crime charged to him was the most serious crime that he could have committed. The judge carefully inquired whether fear, coercion, promise of leniency or any other form of pressure or importuning had in any way brought about the plea. Thus, by traditional method, the judge sought to satisfy himself that the man before him had committed the charged crime and that the offered plea of guilty was voluntary.

The flaw upon which the case turned in the District Court was the failure of Judge Sanford to ask explicitly the reasons for petitioner's change of mind between the morning and the afternoon appearances. His view of this claimed error is portrayed by the District Judge's following observations:

"Well, to me, that [McDonald's change of mind between his morning and afternoon appearances on the day he pleaded guilty] *is a rather suspicious circumstance.*

"The testimony here—of course, Gillan is dead, [Gillan was the Muskegon County undersheriff who was charged with the false promises and threats which induced McDonald's plea] and I don't know what his testimony would be—but the testimony here [that of McDonald, the only survivor of those who knew the truth of his accusations] is that between those two appearances before Judge Sanford on that day he had a discussion with Gillan, in which Gillan led him to believe that he had a chance for probation. And, when you are confronted

with a situation where a plea of guilty is entered to any type of criminal charge on a promise by a law enforcement officer, either as an express promise or an implied promise—and it could be considered here to be an implied promise of probation—that, then, that is not a good plea of guilty." (Emphasis supplied.)

The District Judge commented further:

"And, of course, I have a lot of respect for Judge Sanford, but I think it *would certainly agitate my curiosity* to the extent that I would inquire as to what brought him back so soon." (Emphasis supplied.)

We may at this distance in time and with our opportunity for reflection, now regret that Judge Sanford did not entertain the suspicion, the lack of which has brought about the order before us. But must it be said that a mature judicial mind would necessarily find extraordinary an admittedly guilty person's decision, made in the course of a few hours, to end the matter by a plea of guilty? Whether more pointed questions prompted by such suspicion would have brought different answers from the accused will never be known, but the questions that were asked clearly called for disclosure of the circumstances upon which petitioner now relies. Perhaps the Circuit Judge should have been dissatisfied with the answers he got, and instituted some type of inquisition of the sheriff's officers, prompted by a concern that they possibly had been guilty of some undefined misconduct. No decisions, however, have announced a rule compelling such action.

■ In any event, the District Judge made a factual finding that McDonald's plea of guilty was involuntary, announcing the correct rule of law that a plea which is the product of coercion and false promises cannot be tolerated. Walker v. Johnston, 312 U.S. 275, 286, 61 S.Ct. 574, 85 L.Ed. 830, 836 (1941); Smith v. O'Grady, 312 U.S. 329, 334, 61 S.Ct. 572, 85 L.Ed. 859 (1941).

■ Unless we can say that such finding was clearly erroneous or that applicable law was misapplied, we are not at liberty to set it aside. Rule 52(a), F.R.Civ.P. Graver Tank & Mfg. Co., Inc. v. Linde Air Prod. Co., 336 U.S. 271, 275, 69 S.Ct. 535, 93 L.Ed. 672 (1949); United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949). We do hold such finding clearly erroneous. Therefore, to expose the reasons for such holding, we set out as briefly as we can a more particularized history of this matter.

About 5:30 in the morning of January 8, 1948, petitioner broke into a gas station at Muskegon, Michigan, bent on larceny. Before he could complete the enterprise the owner, Cox, arrived. We may accept McDonald's statement that this intrusion put him in fear that Cox might have been armed and would shoot him. Seizing a grease gun, he knocked Cox to the ground. Petitioner's fear, however, did not prompt him to flee, but he proceeded to fulfill his original mission; he took the cash register out of the station into a field and pocketed its contents—about $128.00. What led the officers to petitioner is not in the record, but at about 11:00 A.M. that day he was apprehended. At the hearing held to determine the degree of McDonald's guilt, Undersheriff Gillan testified that at the police station McDonald readily admitted the crime. Cox had not then died. McDonald told of seizing the grease gun and striking Cox a first blow which staggered him, a second brought Cox to his knees, and a third put him down. The larceny was then accomplished and petitioner left. Except for the number of blows struck, petitioner does not now offer any substantial amendment to Gillan's account. He says, however, that he was coerced into telling what happened by threats made to him by Gillan. On this same day, petitioner was given a pencil and paper and in his cell and by his own hand wrote out and signed an account of the involved facts. Again, except to say that

he was "ordered" to perform this task, he finds no fault with his written confession's accuracy.

The wounded gas station owner died on January 10. On January 12, Undersheriff Gillan and Deputy Thomas took petitioner from Muskegon to Grand Rapids; there is no dispute that this was for his safety, following, apparently, public reaction to Cox's death. In his 1950 petition and testimony, McDonald charged that he was told that there was a "mob" forming to lynch him. At a 1950 hearing, discussed hereafter, officer Thomas testified:

> "I went up to the cell block myself and got Mr. McDonald out and told him we were transferring him to another jail for his protection. I don't recall any conversation until we got in the car. We told him the reason we were transferring him over to this other jail was that members of his own race had called to the Sheriff's Department and said 'We are coming down to get that boy.' It was our intention to transfer him to the other jail until the date of his trial, that no one would know where he was, and that he would be perfectly safe over there. He said he was scared. We told him he had nothing to be afraid of, that is the reason we were taking him over there so he wouldn't have to be afraid."

and added that "I told him his life was in danger if he was kept in that jail." There is nothing to negate that the officers acted wisely, although there is nothing to suggest that any mob had actually formed.

■ At his second appearance before Judge Sanford on January 23, petitioner went into detail to tell the events that preceded and followed the fatal beating of the gas station owner. In keeping with proper practice, the judge did not content himself with receiving a bare admission of guilt, but obtained in the accused's own words the facts which disclosed his guilt. He explained that a fatal assault in the prosecution of a felony

rendered the offense first degree murder, and told McDonald that such was "the most serious offense" of which he could be accused. He advised that Michigan law required a further hearing to determine the degree of guilt and again told petitioner that he could have a lawyer at such hearing. That hearing was held on January 26. Undersheriff Gillan was there sworn and told of the events of the arrest, petitioner's oral admission of guilt, and his written confession. This was put in evidence, and reads:

> "The clock alarmed at 5:30 and I stayed in bed a few minutes; then I got up and put on my clothes and walked down to the station. Then I looked all around and I saw a man coming down the trail, so I stepped in the corner and stooped down until he pass; then I broke window and went it and I inside one or two or three minutes or so, and he drove up and went around the back; so I thought he was coming around checking the station and stooped down for a minute or two and he come in the front door and went behind the counter and come out, so I thought he went over to the corner by the cola machine, and he came back and started in where I was. I was afraid to run and he might shoot me, and I hit him with the grease gun; so I got the cash register and ran out the front door and went around the station to the right and I dropped it and it came open, so I got the money out of it and went back up in the project and went to the restroom; and spoke to Henry; so I had taken a crap, so Henry left, and I counted money. It was $128.00 was all I have, and I went home and stayed about 3 or 4 hours. So me and my wife went and caught the bus and went around through the Heights to see about her watch and came on down town to see about her dress, and went to the bus station and asked about the bus and went home; and that is where you all got me from and brought me down to jail. Signed J. C. McDonald."

A doctor gave the necessary evidence that Cox's death came from the involved as-

sault. McDonald declined the opportunity then afforded him to question Gillan or the doctor, except to ask the doctor "Did he die?" When asked if he had anything to say before sentence was imposed, he replied that he did not. A life sentence was then imposed; McDonald still remained silent. In the meantime, and in keeping with Michigan law, three psychiatrists of Grand Rapids, appointed as a sanity commission, made a psychiatric examination of petitioner and had reported under date of January 19, 1948, that "J. C. McDonald is sane today and shows no mental illness or defect which would affect his criminal responsibility." It is fair to assume that these doctors were not told by petitioner of any mistreatment or false promises by the sheriff's officers.

Petitioner was taken to the penitentiary and after two and one-half years he made his first recital of the claims that are now the basis of the granting of habeas corpus relief. In the 1965 hearing in the District Court, he said in explanation of his delay in asserting his rights that,

"At the time I was attending academic school and law school, so I got the idea that I was wrong during the proceeding of the original trial and I made up my mind to appeal to him [the judge] for—to have this plea withdrawn,"

and further stated, "it had taken me that long for me to believe that—I mean, to develop myself to the extent that I would be able to make an appeal to him." McDonald told of taking extension courses in prison and that he had there acquired a high school diploma. He said that he had studied decisions of various courts at the prison law library.

Having thus prepared himself, petitioner wrote and, on June 12, 1950, filed in the Circuit Court of Muskegon County, a petition "for leave to file a delayed joint motion to set aside his plea of guilty; to vacate the sentence and judgment imposed thereon; and motion for writ of habeas corpus." Permission to file these delayed motions was granted; the Circuit Judge appointed a lawyer for petitioner and after issues were framed the matter came on for hearing on September 13, 1950. Under direction of his counsel, McDonald testified as follows:

"A. January 8, 1948, when I was arrested and taken into custody by Sheriff Ray Gillan, I was taken to the County Jail and was threatened by Sheriff Gillan. He says *and I quote* 'If you don't start talking, I will take something and fracture your damn skull right here and now' and immediately afterward Sheriff Ray Gillan started drilling me through this alleged testimony offered to the Court until it became a nightmare to be, and then he gave me a pencil and paper and told me to write it just like we have gone over it here, and that I did. On the following Saturday night of this incident, Sheriff Ray Gillan came into my cell and told me, *and I quote* 'The people of the township of Muskegon and Michigan have formed a mob to do me great bodily harm, and they have gathered outside to take you and hang you up, for if you were in the south they would have done taken you and hung you up by your heels'; and immediately he said he heard loud shouts of abuse outside, and I taken Sheriff Ray Gillan's testimony to be true. It is obvious because the records show I was transferred from this County, and he told me after that I was appeared in Court on January 23rd, if I didn't go up and plead guilty, well they would bind me over to the September term of Court, and God only knows what will happen to you between that time, and there is a great possibility you may be found dead. Sheriff Ray Gillan further stated that he had talked with the judge and 'The judge has decided to give you a break, that if you would come on up there and plead guilty; and it was to save the State a hell of a lot of money if you waive a jury trial and counsel of attorney—advice of attorney and he talked as if he may give you probation'; and at the time I was ignorant to the law and I asked Sheriff Ray Gillan what was probation, and he said 'It is your freedom. He will turn you

loose just so you won't get involved in any more trouble for a period of time the judge may fix'; and the sheriff Ray Gillan started drilling me through the questions that I was expected to be asked by the Judge. He said that the Judge will ask you when you appear in Court did anybody threaten you, hit you, or promise you anything, and you tell him No. Just a moment, I am trying to get it straight just as it was. (Witness hesitates.)

"Mr. Loyda: Have you said everything you wish to tell the Court? My understanding is that you appeared in Court in the morning and at that time you asked the Court to have an attorney, is that correct?

"A. That is right.

"Q. You were then taken back to the County Jail and then in the afternoon at approximately 3 o'clock you came back and you informed the Court that you wished to enter a plea of guilty, is that correct?

"A. That is correct.

"Q. Now these things you have just stated and these happenings you have just stated, are they the reason you came to the Court and entered a plea of guilty?

"A. That is correct. Further, I would like to finish my testimony.

"The Court: Go right ahead.

"The Witness: Sheriff Ray Gillan then told me if I didn't plead guilty they would pin my damn ears back and make it too bad for me, so I told Sheriff Ray Gillan that I would go and plead guilty and follow his instructions, and so that I did, after I appeared in Court that afternoon.

"Mr. Loyda: And it was because of the things you have just testified to is the reason then that you entered a plea of guilty, is that correct?

"A. Those are the reasons I pleaded guilty."

The foregoing was followed by his statement that his 1948 answers to the Circuit Judge were induced by the threats and the promises of the officers who had, he said, coached him as to just how he would have to respond to the Circuit Judge's questions. His testimony was succinct, but sufficiently comprehensive to make out a case for relief. Undersheriff Gillan, the chiefly accused officer, had died on September 11, 1950, two days before the September 13 hearing. Petitioner had learned of this circumstance before he took the stand. The prosecuting attorney, however, put on Robert Thomas who as a deputy sheriff was very active in the handling of McDonald after his arrest. Thomas had been included in some of McDonald's accusations of threats and promises, expressly with reference to the reports of a lynch mob. In his testimony McDonald had embellished his account of the mob, declaring that Gillan had heard "shouts of abuse" but there was no corroboration of a mob actually forming and Thomas denied its existence. Thomas, with Gillan, had conveyed McDonald to the Grand Rapids jail and gave his account of the trip, which we have set out above.

Thomas denied ever hearing the threats and promises attributed to Gillan and directly denied those attributed to him. He said he had never known of Gillan making "any statement like that to anyone." Thomas gave his own account of McDonald's written confession, saying:

"At that time I believe that was the same day that he had made the confession that he had hit Mr. Cox with this grease gun. He had told the entire story out to Glenn Corey, and under sheriff Gillan. I was not present when he made that confession. I had gone out to check on the brother, I believe it was Mr. McDonald's brother, to check on his whereabouts that night. When I came back to jail Mr. Gillan told me he made that confession, that they found the money in his shoe. After he was taken to the cell block, I asked Mr. Gillan as long as he was sitting up there if it wasn't a good idea to give him a sheet of paper and pencil and let him write it in his own handwriting what took place. I took the

paper to him that afternoon and went up the next morning after I came to work, after 8 o'clock in the morning, and asked him if he had written that out, and he said yes, and he handed me the slip of paper and I took it downstairs and we read it downstairs. He had that paper from the afternoon over night until 8 or 8:30 the next morning."

We would find a ring of truth in this account by Thomas in his insistence that he, not Gillan, had obtained the confession:

"In my own mind what I wanted to get on that paper was to establish just how he came to hit Mr. Cox and for what reason—if there was a scuffle, or he had waited for him, or just what it was. I believe Mr. Gillan, when he was on the stand to give his testimony made the statement that he was the one that gave Mr. McDonald the paper to write this confession out. I didn't say anything to Mr. Gillan, I felt a little put out, because I was a little proud of getting that written confession from him, when Mr. Gillan said he gave it to him."

Following the 1950 hearing, Judge Sanford, on November 30, 1950, filed an exhaustive opinion exposing his reasons for denying vacation of sentence. With reference to petitioner's claim of a coerced confession and plea, the trial judge said, "His claim in this connection is not sustained by the evidence, and the court believes it to be *a fabrication from beginning to end*. * * * A reading of the entire record in this case convinces the court, *beyond any shadow of a doubt*, that * * * his confession was voluntary and a truthful statement of his connection with the commission of the offense." (Emphasis supplied.)

Following denial of his 1950 effort, petitioner took no action until fourteen years later when he filed a petition for habeas corpus in the Supreme Court of Michigan. That court entertained his petition and, presumably upon the record which we have above outlined, filed a unanimous opinion on April 9, 1964, reciting:

"In this cause a petition is filed by J. C. McDonald for a writ of habeas corpus with ancillary writ of certiorari, and an answer thereto having been filed by the prosecuting attorney for Muskegon County, and due consideration thereof having been had by the Court, IT IS ORDERED that the petition be, and it hereby is, DISMISSED for the reasons that defendant understandingly waived assistance of counsel and voluntarily pleaded guilty."

On June 1, 1964, the Supreme Court of the United States denied McDonald's application to it for a writ of habeas corpus.

McDonald next sought relief in the United States District Court. In his petition and testimony in the federal habeas corpus proceeding he substantially reiterated his earlier claims. He again frankly admitted the fatal bludgeoning of the gas station owner. Michigan's Attorney General presented in defense the records and transcripts of the various state court hearings since the accused undersheriff and Judge Sanford were both deceased. The District Judge agreed with McDonald that his guilty plea had not been voluntary and ordered him released from custody, but the order has been stayed pending this appeal.

The United States Supreme Court's disposition was presumably not on the merits. Thus we have a situation where a United States District Court has overruled decisions of a Michigan trial judge and its Supreme Court, entered after hearings the fullness and adequacy of which are not questioned. The authority to do so and the limitations upon the exercise of such authority were announced in Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).[1]

---

I. We are disposing of this appeal upon our appraisal of the District Court's finding of fact. It may indeed be that another ground for reversal is present. On November 2, 1966, an Act of Congress, P.L. 89-711 (H.R. 5958) became the law by

We are not free to set aside the District Judge's factual finding unless we can say that it was clearly erroneous. Rule 52(a), F.R.Civ.P. We are constrained, however, by the record before us to hold that it was so erroneous within the rule's meaning. We are aware that in large measure the resolution of the critical factual question called for appraisal of the credibility of petitioner and his testimony vis-à-vis that which opposed it, viz, the testimony of the officers and the credibility of the state trial judge. We believe that notwithstanding his death prior to the 1950 hearing, undersheriff Gillan's testimonial account (given at the January 26, 1948, hearing to determine the degree of McDonald's guilt) of what occurred from the time of McDonald's arrest to his plea of guilty must be read as a denial of the charges belatedly made against him. Deputy Sheriff Thomas' testimony of denial was clear and to us entirely credible. We consider also that Judge Sanford who had the opportunity to observe and hear McDonald and to appraise his credibility, must here be regarded as a witness against petitioner's story. The alleged flaw in his conduct—his failure to be more curious and suspicious when McDonald changed his intentions—has been asserted but, in our view, cannot support, by itself, the release of petitioner.

Colliding with these witnesses (the accused officers and Judge Sanford) we have a man who, in his latest address to a court, candidly admits that he inflicted fatal wounds upon a gas station owner who surprised him in a burglary. We accept his statement that he did so in fear of being shot, although the dead man gave no sign of resistance, and had no chance to do so; neither did the passion and fear of the moment cause petitioner to flee in fright, for with his victim beaten to the floor, he went on to complete his enterprise of larceny. He waited more than two years, after his "study of law," to put together and disclose the

signature of the President. The Act amended 28 U.S.C. § 2254 to provide that a state court's determination of the merits of a factual issue, such as is presented here, shall be presumed correct unless a petitioner raises and sustains one or more of some eight conditions:

"(1) that the merits of the factual dispute were not resolved in the State court hearing;

"(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

"(3) that the material facts were not adequately developed at the State court hearing;

"(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

"(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

"(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

"(7) that the applicant was otherwise denied due process of law in the State court proceeding;

"(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record."

This statute was not in effect when the order before us was entered. Without study of the legislative history, we pose the question whether this statute is but a codification of the principles announced by Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019, 82 L.Ed. 1461 (1938). If applicable, the only conditions of relevance here would be whether McDonald was "denied due process of law in the State court proceeding" (d) (7) and whether the State court's "factual determination * * * is not supported by the record" (d) (8). The fairness and fullness of the State court hearing is not challenged and were it essential to our decision, we would have to say that the careful 1950 post-hearing opinion and finding of Judge Sanford was "supported by the record" before him and McDonald was there afforded "due process of law."

wrongs he claims were done to him. The record before us amply demonstrates that we are not here dealing with a man of limited intelligence. A fact finder must place the man we have described and his testimony in array with carefully conducted state proceedings and the testimony of its peace and judicial officers. Unless we now indulge a presumption that such officers are, by being such, unworthy of belief, we must strike the balance in favor of those, in this case, who attempted to enforce the law.

▮▮ We have expressed our awareness that the guilt or innocence of one seeking vindication of his constitutional rights is not of controlling importance to us. United States v. Vida, 370 F.2d 759, 764 (CA 6, 1966). Cf. Rogers v. Richmond, 365 U.S. 534, 541 (1961); Davis v. State of North Carolina, 384 U.S. 737, 739, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). We do, however, believe that admitted felonious conduct may, and should, be considered in assessing an individual's credibility. The credibility of opposing witnesses is, of course, generally for the District Judge, United States ex rel. Wissenfeld v. Wilkins, 281 F.2d 707, 713 (CA 2, 1960); American Transit Lines v. Smith, 246 F.2d 86, 88 (CA 6, 1957), cert. den. 355 U.S. 889, 78 S.Ct. 261, 2 L. Ed.2d 188; Bloom v. United States, 272 F.2d 215, 223 (CA 9, 1959), cert. den. 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146; but there can come situations in which the reviewing court can and must reverse when on the entire evidence it "is left with the definite and firm conviction that a mistake has been committed." Lewis v. City of Grand Rapids, 356 F.2d 276, 289 (CA 6, 1966), cert. den. 385 U.S. 838, 87 S.Ct. 84, 17 L.Ed.2d 71, quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1947); United States v. Kaplan, 277 F.2d 405, 408 (CA 5, 1960).

McDonald did not in the state court proceedings or in his habeas corpus petition in the District Court rely, as a ground for relief, on the fact that Judge Sanford did not directly tell him that punishment for first degree murder was life imprisonment. However, in his District Court testimony he said that he did not know that a compulsory life sentence would follow such a plea of guilty. The District Judge said:

"Whether or not he knew that this was serious—a mandatory sentence of life imprisonment—as far as the record is concerned, he said he didn't know and that isn't rebutted either."

▮ The Circuit Judge did tell McDonald that first degree murder was "the most serious" crime to which he could plead guilty. While advice of the ranges of punishment has been mentioned as part of proper interrogation preceding acceptance of a plea, Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948), we do not consider that any decision has announced a mechanical rule that such omission, standing alone, will always vitiate a sentence. See United States v. Parrino, 212 F.2d 919, 921 (CA 2, 1954), cert. den. 348 U.S. 840, 75 S.Ct. 46, 99 L.Ed. 663. Without here reviewing recent landmark decisions which have expanded and strengthened the protections surrounding individuals accused of crime, we do not read them as fashioning rigid unyielding rules of constitutional stature to be always applied wholly without reference to the factual background to a claimed deprivation of a constitutional right. We, of course, are not dealing with admission at trial of a confession allegedly coerced from a man who was standing trial on a plea of not guilty. Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). In that case the accused had persisted in denying his guilt and only "broke down" after many days of questioning. Here McDonald told of his guilt within an hour after he was taken into custody. At the hearing in the District Court, answering his own counsel's question "Was the confession true?" he responded, "Yes a portion of it, that I should—the best of my knowledge it was." He said that he admitted striking Cox three times, and the only amendment he has ever made was to say he struck only one blow.

It can, of course, be asserted that the fatal blows were struck without malice aforethought or premeditation, and that except for their accompanying a felonious breaking and entering, first degree murder would not be involved. But such a felony was involved and the trial judge carefully explained this situation to petitioner. McDonald has been in prison now for 18 years and if it is true that neither wilfulness nor premeditation were involved, such circumstances might suggest termination of McDonald's imprisonment. We must, however, leave that matter for the consideration of the Michigan authorities and, if appropriate, to the exercise of executive clemency.

We hold that the District Court was in error in holding that McDonald's plea was involuntary, and the order entered thereon was unwarranted.

The order is vacated, with direction to dismiss the petition for habeas corpus.

## APPENDIX A

### STATE OF MICHIGAN
### THE CIRCUIT COURT FOR THE
### COUNTY OF MUSKEGON

THE PEOPLE OF THE STATE
OF MICHIGAN

vs.

J. C. McDONALD,

Defendant.

STENOGRAPHIC RECORD

(Jan. 23, 1948, P.M.)

of the proceedings had in the above entitled cause, in said Court, on the 23rd day of January, 1948, before Hon. Joseph F. Sanford, Circuit Judge.

*   *   *   *   *   *

APPEARANCES:

FREDRIC A. GRIMM, Prosecuting Attorney, appeared on behalf of the People.

The defendant was not represented by counsel.

THE COURT: You were arraigned here this morning on a charge of committing murder in connection with the commission of a felony, and you told me then that you wanted to secure a lawyer of your own choice before you pleaded in this case. Do I understand that you have since made a request that you wanted to say something more to me?

J. C. McDONALD: Yes sir. I was awful sorry. I didn't know what to do this morning, for one thing. But I told you that I wanted an attorney. But afterwards—well, I didn't know what to do. But I say—I told you that I wanted an attorney, but afterwards I changed my mind and I wouldn't accept one anyway. I'm awful sorry.

Q. Do you want an attorney? That's all we're talking about now. Do you want an attorney to advise you before you enter a plea of any kind in this case?

A. No.

Q. Are you sure of that now?

A. Yes.

Q. You won't, later on, say that you were rushed through here and wanted an attorney and didn't have a chance to have one?

A. No.

Q. You understand, that if you desire, that, you're entitled to a trial by a jury on this charge, or by the Court without a jury? Do you know you have that right?

A. Yes.

Q. You're entitled to a trial by a jury, or by the Court without a jury if you want to. Do you understand that now?

A. Yes.

Q. Do you want a trial on this charge?

A. No sir.

Q. Do you understand that if you want legal advice before you enter a plea in this case and haven't the money to hire a lawyer, that the county will pay for a lawyer to advise with you? Do you understand that you have that right?

A. Yes.

Q. Do you want a lawyer, on that basis?

A. No.

Q. Well, do I understand then that you don't want a lawyer's advice or counsel at all before you enter a plea in this case? Is that correct now?

A. Yes.

Q. Do you wish to enter a plea in this case at this time, of guilty or not guilty?

A. Guilty.

Q. You understand that you're accused of first degree murder in this case —murder in connection with the commission of a felony? You're accused of breaking and entering in the night time, on January 8, 1948, in the Township of Muskegon, Muskegon County, Ted's Service Station at 2591 Henry Street, Muskegon Township, in the night time, with the intent to commit the crime of larceny— that means to steal and unlawfully take the property of another—therein; and further, that you did unlawfully and feloniously take and remove one cash register containing upwards of a hundred and twenty-eight dollars in lawful currency of the United States, belonging to Gordon Cox and Ted Eisenlohr. You are further accused that while engaged in the commission of that burglary, you did then and there lie in wait, and with and by means of a certain dangerous and offensive weapon, a grease gun, feloniously, wilfully, deliberately, premeditatedly, and with one who while in the commission of a felony, and in furtherance of it, kills a person, is guilty of first degree murder. Do I make that plain to you?

A. Yes.

Q. In other words if a man is committing a robbery and while he's committing it, he kills a person, he's guilty of first degree murder. If he's committing a burglary, and in furtherance of the commission of the burglary, kills a person, he's guilty of first degree murder. Do you understand that?

A. Yes.

Q. Do you understand you're accused of first degree murder, for killing Cox while in the commission of this burglary and larceny? Do you understand that charge?

A. Yes.

Q. If you don't, now is the time to say so. I'll be glad to explain it to you. Do you say that you're guilty?

A. Yes.

Q. Of committing that offense?

A. Yes.

Q. Did you commit it at that time and place?

A. Yes.

Q. Did you break and enter the premises mentioned here, this filling station, in the night time, before it was daylight?

A. Yes.

Q. Did that occur on January 8, 1948?

A. Yes.

Q. About what time would you say this matter occurred, approximately?

A. Oh between five-thirty and six.

Q. What's that?

A. I figured— ·

Q. What time did you enter there?

A. Well just exactly, I wouldn't know. But I got up at five-thirty.

Q. I see. It was some time between five-thirty and six that you entered this Ted's Service Station, is that it?

A. Yeah.

Q. How did you get in there?

A. I cracked the pane and unlatched the window.

Q. You cracked a pane of glass and reached up and in and unlatched the window, and then what did you do?

A. Went in.

Q. Through the window?

A. Yes.

Q. Did you intend to steal money or some property if you could find what you wanted in there?

A. Yes.

Q. You understand that stealing or larceny is the unlawful and felonious wrongful taking of property of another with the intent to permanently deprive the owner of it? You understand that's larceny?

A. Yeah.

Q. Was that your purpose in breaking into this place?

A. Yes it was.

Q. And after going in with that purpose, did you actually take any money or property into your possession?

A. Yes, I taken some.

Q. Was it a hundred and twenty-eight dollars, or some such sum as that?

A. Yes.

Q. Was it in currency—that is, dollar bills or larger bills of the United States?

A. Yes.

Q. And you had no permission to go in there and take that money, did you?

A. No I didn't.

Q. And how did it happen that you struck Cox with this grease gun. When did that occur?

A. Well just shortly after I was in there, he came in.

Q. Oh, had you taken the money before he came in?

A. No.

Q. While you were in there, and before you had taken the money, he entered, is that right?

A. Yeah.

Q. You didn't expect him that early, did you?

A. No.

Q. His entry was unexpected, is that right?

A. Yeah.

Q. And then what did you do, when he entered the place?

A. Well when he entered I was back in the garage, and so he came on in there and went over behind the counter and came up and went back there somewhere. I didn't see him, where he went. He came back and started in the door.

Q. Started in the door where you were?

A. Yeah.

Q. This was all one building?

A. Yes, all one building.

Q. There was the front part, or filling station part; and the back part for car repairs and mechanical work?

A. Yeah.

Q. And you were in the back part when he came in the front, is that it?

A. Yeah.

Q. Then you say he went to the cash register in the front part?

A. Yeah.

Q. And then did he come back toward the back room where you were?

A. Yeah.

Q. What did you do then?

A. Well I hit him, in order to get out, because I was afraid he would shoot me.

Q. You were afraid perhaps he might shoot you?

A. Yes.

Q. You hadn't taken anything at that time, is that right?

A. No.

Q. And you were in fear that he would see you there and possibly shoot you, is that it?

A. Yeah.

Q. Then what did you strike him with?

A. A grease gun.

Q. Was that a fairly heavy apparatus? What do you think it would weigh?

A. Well it didn't seem so heavy.

Q. What do you think it weighed?

A. Oh well, I reckon about—I don't know—about five pounds, to my estimation.

Q. How many times did you hit him?

A. About three times, I guess.

Q. Whereabouts did you hit him?

A. On the head.

Q. And you struck him intentionally, to prevent him shooting you or giving an alarm? Is that what you mean to tell me?

A. Yes, to keep him from shooting me.

Q. Did his head bleed there?

A. Yes, it bled a little bit.

Q. In other words you saw blood on his head before you left?

A. Yes.

Q. And then after striking him, you say three times, with this grease gun, what did you do then?

A. I grabbed the money there— what's it—?

Q. Hundred and twenty-eight dollars, or thereabouts?

A. Yes.

Q. And what did you do with it? Where did you put it?

A. I ran out and taken it and went on home with it.

Q. I see.

A. Put it in my pocket.

Q. Put it in your pocket and left the filling station, is that right?

A. Yes, after I taken it down there.

Q. After what?

A. After I taken it out of the—

Q. Cash register?

A. Yes.

Q. So your taking it out of the cash register occurred after you struck him with the grease gun?

A. Yeah.

Q. You took money out of the cash register and put it in your pocket and then you left the premises, is that right?

A. Yes, I taken the cash register.

Q. Oh you took the cash register. And whereabouts did you take the money out of it?

A. Out back of the filling station.

Q. You took the cash register around outside, then back of the filling station and removed the money from it, then you left the cash register?

A. Yes.

Q. Then where did you go from there?

A. I went on home.

Q. And how long after that, were you arrested?

A. Oh let's see, about a couple hours, I guess.

Q. And did you admit the commission of the offense substantially—that is, like you have given it to me here—to the officers later on? Is that right? Did you tell the officers that you did just about what you have told me?

A. Yes.

Q. How long after you had gotten in this filling station, did Cox come in?

A. Well he came in just shortly after I was in there.

Q. Would you mean by that, several seconds?

A. Well maybe a minute or two.

Q. You hadn't had a chance to get in the cash register yet, is that it?

A. No.

Q. He came in before you had a chance to go over to the cash register?

A. Yes.

Q. And you say you struck him, fearing that he might shoot you or give an alarm that would cause your being caught, is that right? Is that what you had in mind when you struck him?

A. Well, wasn't so much getting caught that I—you know?—so afraid of —I was afraid he would shoot me.

Q. You were afraid he might shoot you?

A. Yes.

Q. It was dark then, was it?

A. Yes.

Q. That was January 8th, of this year, 1948, and it was between five-thirty and six, and it was dark? No mistake about that?

A. No.

Q. Wasn't daylight yet?

A. No.

Q. Had you spent any of this money you took, up to the time you were arrested?

A. No.

Q. Did you turn it over to the officers?

A. Yes.

Q. And have you told the officers in the case, the same story as to how this happened that you have told me, or substantially—practically the same?

A. Yeah.

Q. And I'm telling you again, that you're accused of first degree murder. Do you understand that's the most serious offense that you could be accused of committing? Do you understand that?

A. Yeah.

Q. Now you have been in custody of the officers since January 8, 1948, a few hours after you committed this offense, is that right?

A. Yes.

Q. And you have come up here and you have told me that you broke and entered this filling station in the night time, with intent to commit larceny, to steal therein; that you broke and entered there; that before you had a chance to go to the cash register or try to find any money, that Cox entered, is that right?

A. Yes.

Q. And that when he entered, you were in fear that he might shoot you because of your committing a burglary. For that reason, you struck him three times over the head with a grease gun, is that right?

A. Yes.

Q. And you were attempting, or were in the process of committing a burglary when he entered there, and when you struck him, is that right? Now is that a fair statement?

A. Yes.

Q. Did you intend to kill him when you hit him over the head with the grease gun?

A. No I didn't.

Q. You intended to incapacitate him temporarily, at least, and so—

A. I could get out.

Q. So you could escape, is that right?

A. Yeah.

Q. Did you hit him hard with this grease gun? Did you swing it hard, or fairly hard?

A. Well no, not—it didn't seem like it to me, that I hit him—I didn't draw it back very far.

Q. But you intended to hit him and incapacitate him, at least temporarily, so you could prevent him from shooting you or taking you in custody, is that right now?

A. Yeah.

Q. Now are you entering this plea of guilty freely? That is, have you made your own decision to do this; to come up here and admit your guilt? Is that your own decision?

A. Yes.

Q. Has anyone influenced you or talked you into coming up here and admitting the commission of this offense?

A. No.

Q. Has anyone used any force or pressure or threats upon you, that has caused you or influenced you to plead guilty?

A. No.

Q. Nobody has harmed you?

A. No.

Q. You haven't been subjected to any physical abuse?

A. No.

Q. Between the time you were arrested and this time, is that right?

A. Yes.

Q. Has anyone promised you leniency —that means that you would get a lighter sentence more favorable to you if you pleaded guilty?

A. No.

Q. I have already explained to you twice now that if you're not guilty, you're entitled to a jury trial or a trial without a jury by the Court. I have explained that to you?

A. Yes.

Q. And I also explained to you that if you wanted legal advice, you were entitled to it; even to the county paying for a lawyer if you couldn't afford one. Now do you understand all that?

A. Yes.

Q. Is there anything more that you would like to say to me at this time, in connection with this offense? Is there anything more you want to say?

A. No.

Q. Well now, in a case of this type it's necessary in addition to conferring with you and having you enter a plea, to take testimony. Killing a person unlawfully in the commission of a felony is first degree murder; and under the law of this state we are required to produce other evidence of the commission of the offense before a plea of guilty, or before any degree of the crime is fixed. We have to take proof to fix the degree of murder. There's first degree murder and second degree murder. We can't tell which degree it is without taking proof as the law provides. So I'm going to set the taking of proof in your case to determine the degree of murder for ten-thirty this coming Monday morning. Now you don't want a lawyer at that time, as I understand? Is that right?

A. No, I don't want one.

Q. We'll have you here at ten-thirty this coming Monday, and we'll have other proof here at that time to enable me to determine the degree of murder. So we'll want him here at ten-thirty Monday morning, and you'll have the necessary witnesses to testify?

MR. GRIMM: Yes, your Honor.

THE COURT: All right. I'll wait until we have heard the testimony Monday morning before I determine what degree —whether first or second degree murder was committed.

\* \* \* \* \* \*

MATHES,\* Senior District Judge (concurring specially).

I agree unqualifiedly that the order of the District Court should be reversed; but would advance as the first ground for reversal that the State-court hearing in 1950—two years after the crime—was "full, fair, and adequate" [see Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)]; and since the fullness, fairness, and adequacy of the 1950 State-court hearing have not been challenged, and more particularly were not challenged at the 1965 District-court hearing, it was an abuse of "sound discretion" for the District Court in 1965 to hold an evidentiary hearing and assume to make findings of fact contrary to those which had been made by the State court on like evidence some fifteen years before. [Townsend v. Sain, supra, 372 U.S. at 318, 83 S.Ct. at 760; see Note, State Criminal Procedure and Federal Habeas Corpus, 80 Harv.L.Rev. 422 (1966).]

Secondly, I would invoke the 1966 amendment to 28 U.S.C. § 2254 [Public Law 89–711 (1966)] wherein the Congress decreed that State-court findings of fact made, as here, after "full, fair, and adequate hearing", must be presumed by the Federal courts to be correct.

This Congressional mandate is too clear to be doubted or disregarded. [See Senate Rept. No. 1797, U.S.Code Cong. and Adm. News (89th Cong.2d Sess.), pp. 3663–3672 (November 20, 1966).]

Lastly, I would concur in all the majority say in demonstrating that the findings of fact of the District Court were, in any event, clearly erroneous.

---

\* William C. Mathes, Senior District Judge of the Southern District of California, sitting by designation.