UNITED STATES of America ex rel.
Joseph Russell BRESNOCK

v.

Alfred T. RUNDLE, Superintendent.

Misc. No. 3879.

United States District Court
E. D. Pennsylvania.

May 27, 1969.

Charles F. G. Smith, Devon, Pa., for petitioner.

Richard B. Russell, Dist. Atty. of Schuylkill County, Pottsville, Pa., for respondent.

## OPINION

MASTERSON, District Judge.

The relator, Joseph Russell Bresnock, currently is imprisoned at the State Correctional Institution at Graterford, Pennsylvania. He is serving concurrent terms of imprisonment there of two and one-half to five years and ten to twenty years imposed by the Court of Quarter Sessions of Schuylkill County, Pennsylvania, on September 26, 1960. These sentences were imposed upon the relator after he pleaded guilty to charges of Prison Breach, in violation of P.L. 575 § 1, July 12, 1961, Title 18 P.S. § 4309, and Holding a hostage in a penal institution, in violation of P.L. 872, § 723.1, June 24, 1939, Title 18 P.S. § 4723.1, contained in Bills of Indictment Nos. 893, and 894, of the November Term, 1960.

The relator did not challenge the entry of his guilty pleas until June 4, 1965, when he filed a petition for writ of habeas corpus with the state trial court. In his petition he alleged that his conviction was unconstitutional because he had been deprived of the effective assistance of counsel, had been coerced into making a confession, and

had involuntarily and unknowingly entered his guilty pleas. After a hearing on April .18, 1966, the state trial court denied the petition by Opinion and Order dated December 12, 1966. The relator's subsequent petition to the Superior Court of Pennsylvania was dismissed per curiam, on July 16, 1967, and his petition for allowance of appeal to the Supreme Court of Pennsylvania was denied on August 24, 1967. He has filed this petition for a writ of habeas corpus pursuant to Title 28 U.S.C. § 2241 et seq. For the reasons discussed below the relator's petition is granted.

I

Although the state trial court conducted a fairly comprehensive evidentiary hearing on the matters raised in the relator's petition there for habeas corpus, this Court has conducted a further evidentiary hearing for purposes of assuring the relator the fullest opportunity to complete his factual record. Testimony presented at both these hearings, and in the course of other relevant proceedings, establishes the following as the relevant factual background of this case.[1]

During the summer of 1960, the relator was imprisoned at the Schuylkill County Prison in Pottsville, Pennsylvania, awaiting trial on charges of carrying a concealed deadly weapon in violation of the Uniform Firearms Act, and of violating the conditions of his parole, as specified in Bills of Indictment Nos. 757, and 757A, September Term, 1960. For purposes of defending himself against these charges he was represented by an attorney who had been retained privately by his family in June or July of 1960 (FHH, N.T., 109), and who had had extensive trial experience generally throughout the Commonwealth of Pennsylvania and particularly before the Courts of Schuylkill County. (SHH, N.T., 104.) Trial on these charges was

---

1. For purposes of convenience references to the transcripts of the various hearings conducted in this case are abbreviated as follows: (1) Arraignment on September 20, 1960—A; (2) Sentencing Hearing on September 26, 1960—SH; (3) State Habeas Hearing on April 18, 1966—SHH; and (4) Federal Habeas Hearing on November 21, 1968—FHH.

scheduled for Wednesday, September 14, 1960.

On Tuesday evening, September 13, 1960, Wayne Brown, a co-prisoner of the relator at Schuylkill County Prison, complained about a headache to Guard Peter Humetsky and asked Humetsky to give him some aspirin. The relator, who in the preceding weeks had discussed with Brown the possibility of escaping, and who recognized at this time that Brown was initiating an escape that evening, approached Humetsky and demanded that the latter surrender his prison keys. At the time the relator carried a wooden replica of a 38-automatic pistol in his pocket and it appears that he, at least, threatened Humetsky that he had a gun, and that, probably, in threatening the guard, he poked him in the ribs or in the back with the wooden gun. (SH., N.T., 5; to the contrary, see, SHH, N. T., 30.)

While the relator and Brown were escorting Guard Humetsky out of the prison cell block they encountered two other guards, James L. Sullivan and Robert Huffman. They informed them that they were staging an escape and indicated to them that they were armed. Either Brown or the relator herded and locked Humetsky and Huffman in a closet at the end of the corridor of cells, and, taking Sullivan with them, they proceeded to leave the cell block. They walked towards the outer wall of the prison which they intended to scale with a ladder taken from a prison stockroom. As they were climbing the ladder the escape was aborted when they were apprehended by the Warden of the Prison, John Downey, and several other guards. The relator and Brown quickly surrendered and they were placed immediately in solitary confinement.

· Later that evening the relator was taken to the Warden's room for purposes of interrogation. The Chief Schuylkill County Detectives at that time, William Keuch, conducted the interrogation and prepared a statement inculpating the relator in the crimes of prison breach and holding a hostage. Relator started to sign the confession but changed his mind, declaring that he did not want to sign the statement, i.e., "I see too much of this statement business, and I won't sign it." (SH, N.T., 8.) The Commonwealth concedes that the relator was not represented by counsel during this interrogation.

Relator's trial on the charges against him in Bills of Indictment Nos. 757 and 757A, which had been scheduled to commence on Wednesday, September 14th, was continued because of the relator's involvement in the attempted escape the night before. Relator's counsel did visit the prison on Wednesday, however, and at that time the relator told him about the attempted escape and asked counsel to represent him on any charges which might arise out of that incident. (FHH, N.T., 83.) Counsel assured relator that he would inquire from the relevant authorities what crimes, if any, were to be charged against the relator, and that he would represent him against any charges. (SHH, N.T., 12, 44–46.)

Relator's trial on Bills of Indictment Nos. 757 and 757A commenced later that week, on September 16th, and during that afternoon a jury returned a verdict of guilty on both charges. After the jury announced its verdict relator's counsel suggested to the Court that it order a psychiatric examination for the relator who had acted in a highly emotional fashion throughout the week. (SHH, N.T., 110, and FHH, N.T., 87.) The Court deferred its decision on this request until Tuesday, September 20th, the day scheduled for sentencing on these convictions.

Throughout all the collateral proceedings in this case the relator has insisted that late on the evening of Monday, September 19th, he was escorted surreptitiously to a preliminary hearing conducted before an Alderman. In its Opinion, dated December 12, 1966, denying the relator's Habeas Corpus petition, however, the state trial court found as a fact that the Alderman's Hearing was conducted during the afternoon of September 19th and all credible testimony

advanced here requires an identical conclusion. (FHH, N.T., 27.) At this hearing the relator was not represented by his trial counsel. The relator was charged by informations presented at the hearing with the crimes of prison breach and holding a hostage and he entered oral pleas of guilty to those offenses.

On the next day, Tuesday, September 20th, the relator was sentenced on both charges contained in Bills of Indictment Nos. 757 and 757A. After the sentencing was completed he was arraigned on Bills of Indictment Nos. 893 and 894 which charged him with the crimes of prison breach and holding a hostage. Counsel announced to the Court the relator's intention to plead guilty to these offenses, as they had been recited by the District Attorney, and the Court, without interrogating the relator at all about his understanding of the offenses charged or about his understanding of the consequences of pleading guilty, accepted the pleas, and continued the Sentencing Hearing until Monday, September 26th. (A, N.T., 1–2.)

The record does not indicate clearly how often or how extensively the relator and counsel conferred between September 20th and September 26th. It does appear, however, that they did meet, at least once, on the 23rd, when counsel explained to relator, possibly for the first time, the penalties which could be imposed upon him under the Hostage Act. (SHH, N.T., 109.)

At the Sentencing Hearing on Monday, September 26th, the Commonwealth produced one witness, Detective William J. Keuch, for purposes of re-constructing the circumstances of the two crimes. Keuch testified in essence to the facts summarized supra, pp. 2–3. Over objections by relator's counsel, relator's partially signed inculpatory statement of September 13th was introduced into evidence for the limited purpose of corroborating Keuch's testimony. (During the hearing relator's wooden replica of a pistol also was marked and identified as an exhibit.) During Keuch's testimony,

Warden Downey and Guards Humetsky and Sullivan were present in the courtroom, and, although they were not sworn, the Court, without objection by relator's counsel, permitted these witnesses to indicate their agreement with Keuch's résumé of the facts.

On the relator's behalf counsel simply had the relator himself testify to two aspects of the crime which allegedly supported the contention that the relator had not used any violence during the attempted escape. Counsel made no plea on his client's behalf in an attempt to mitigate sentence. As noted supra, p. 1, the Court imposed prison terms of two and one-half to five years, and ten to twenty years, on Bills of Indictment Nos. 893 and 894 respectively. The relator did not appeal this conviction although later he filed the state petition for writ of habeas corpus which ultimately was denied by a court at every level of Pennsylvania's judicial hierarchy.

II

In his petition here for writ of habeas corpus the relator advances four separate contentions which allegedly support a conclusion that he currently is incarcerated in violation of the Federal Constitution: (1) that his pleas of guilty were neither voluntarily nor understandingly made; (2) that he was deprived the effective assistance of counsel because he was not represented by counsel at the Alderman's Hearing; (3) that, in general, his privately-retained counsel represented him in such an unreasonable fashion as to deprive him of his right to the effective assistance of counsel; and, (4) that the indictments on which his conviction was based were illegal.

Relator did not advance his third and fourth contentions to the state courts and, particularly since the Commonwealth has not indicated an intention here to waive the exhaustion requirement, it therefore would be inappropriate for this Court to consider either of these contentions at this time. See generally, United States ex rel. Boy-

ance v. Myers, 372 F.2d 111, 112–113 (C.A. 3, 1967). This Court also can not agree with the relator's second contention challenging the Commonwealth's failure to provide him with counsel at the Alderman's Hearing since, absent extraordinary circumstances not present here, a preliminary hearing is not a critical stage of a criminal proceeding in Pennsylvania. See, e. g., United States ex rel. Peterson v. Russell, 266 F.Supp. 93, 94 (W.D.Pa., 1967), United States ex rel. Maisenhelder v. Rundle, 229 F.Supp. 506, 508–509 (E.D.Pa., 1964), aff'd 349 F.2d 592, and Commonwealth ex rel. Butler v. Rundle, 416 Pa. 321, 206 A.2d 283 (1965).

■ Relator adequately has exhausted all state remedies available for considering his first contention relating to the voluntariness of his guilty pleas, however, and this legal contention, if supported by substantial factual evidence, is, of course, one which can justify a conclusion that he was, and is, detained unconstitutionally. See, e.g., United States ex rel. Thurmond v. Mancusi, 275 F.Supp. 508, 514–519 (E.D.N.Y., 1967). After examination of the entire factual record in relator's case, this Court is convinced that the relator neither knowingly nor voluntarily entered his pleas of guilty to the charges of prison breach and holding a hostage, and, that, accordingly, the relator is entitled to a new trial on those charges.

■ In the absence of any interrogation by the trial court of the relator's understanding of his guilty pleas, the burden of demonstrating the validity of those pleas rests upon the Commonwealth. See, United States ex rel. Crosby v. Brierley, 404 F.2d 790, 795 (C.A. 3, 1968), and United States ex rel. McCloud v. Rundle, 402 F.2d 853, 857 (C.A. 3, 1968). In sustaining its burden the Commonwealth must show that the "totality of circumstances" present at the time when the relator entered his pleas were such as would indicate that he voluntarily and understandingly pleaded guilty. Among the circumstances to be considered are the following: the relator's age and background; the consistency, or lack of consistency, in the pleas made by the relator throughout the pretrial and trial stages of the case; the extent, if any, to which the trial court conducted an inquiry into the relator's understanding of his plea; the trial counsel's familiarity with the law; and, the relator's opportunity to consult with trial counsel. See, *Crosby*, supra, 404 F.2d at 802.

The testimony of relator's trial counsel at the State Habeas Hearing graphically described relator's disturbed state of mind at the critical time when he made his guilty pleas:

"* * * this boy was nervous, very nervous, very ill at ease, very much emotionally disturbed, and he was frightened. He kept repeating to me that they would throw the book at him, that he was told they would put him away for the rest of his life if he didn't plead guilty and that, therefore, he would like to plead guilty",

"* * * I don't think this boy, Joe, really knew what he was doing, because, as I said, he was terribly emotionally disturbed. He was a nervous wreck, and he was scared, so badly scared that no matter what I would say to him he would always come back with the same thing, that they will throw the book at me * * *" (SHH, N.T., 107);

and further,

"* * * every time I saw him he was emotionally upset, disturbed, and scared, frightened * * * I don't think he was responsible for anything he might have said because of his great emotional disturbance * * *" (SHH, N.T., 109).

His testimony at the hearing conducted here was to similar effect:

"My impression at the time he was (sic) so badly disturbed emotionally and so upset I don't think he under-

stood the serious nature of the charges." (FHH, N.T., 86);

and,

"He was highly disturbed * * * wild at times with these statements and he wouldn't listen * * *. He was emotionally disturbed. He was agitated. He was upset. He was scared." (FHH, N.T., 105–113.)

The substance of relator's own testimony here and in the state court was similar to that of his counsel. Although the relator's rendition of the critical facts was contradictory and less than creditable in certain instances, this Court is unable to overlook the clear thrust of the consistent testimony of his counsel, i.e. between the time of the attempted escape and the time of sentencing, some two weeks, the relator consistently remained too emotionally upset to rationally and soberly make the judgments upon which a voluntary and knowing guilty plea must be based.

It can be argued that the relator's participation at the Sentencing Hearing on September 26th indicated that he was not so emotionally disturbed as to be unable to understand the nature of the crimes charged against him and the consequences of entering his guilty pleas, and, indeed, relator's counsel did suggest this:

"I think he was capable of making an intelligent decision, but I think he was so emotionally disturbed and upset by it that he just didn't—would you say he didn't listen or didn't understand." (FHH, N.T., 109).

Moreover, in the course of his testimony here defense counsel stated that he did not believe that the relator's state of mind was such as to warrant a defense of insanity or such as to require him to request a continuance (FHH, N.T., 119–120). The limited significance of this latter point, however, is rebutted by the fact that counsel *on his own motion,* only a week and a half prior to the Sentencing Hearing, had requested the Court to have the relator examined by a psychiatrist. See, supra, p. 4, and

(FHH, N.T., 117). Similarly, any inference of relator's understanding which arguably arises from his participation at the Sentencing Hearing is contradicted by the extensive consistent testimony of his trial counsel, summarized above, which negatives a contention that relator understood any of the consequences of the "knowing" acts he now attacks.

Among other relevant circumstances which support this Court's conclusion that relator's pleas were unknowing is the fact that trial counsel himself did not understand thoroughly the consequences which relator faced by pleading guilty to the charges contained in Bills of Indictment Nos. 893 and 894. Although testimony on this point is somewhat conflicting, it appears that counsel, at best, first familiarized himself with the provisions of the Hostage Act, providing for possible imprisonment for any term of years including life, on September 23rd, three days *after* the relator entered his plea of guilty to this offense, and only three days prior to the Sentencing Hearing. (FHH, N.T., 90 and SHH, N.T., 109.) In fact, evidence adduced here suggested that counsel remained unaware of the maximum punishment which could have been imposed under the relevant state statutes even after the imposition of sentence. (FHH, N.T., 129.)

Although it denied the relator's position for habeas corpus relief the state court did comment that "* * * the defendant was in a state of excitement and nervousness that compelled him to enter a plea of guilty * * *", Opinion, filed December 12, 1966, p. 5. This court nevertheless held that this fact was of no consequence in view of the further fact that the relator had not alleged that he "* * * had a good and valid defense to the charges on which he entered his plea * * *", Ibid.

A determination of a defendant's guilt or innocence has been held to be irrelevant to a resolution of the issue of whether or not a guilty plea was voluntary and knowing. Heideman v. United States, 281 F.2d 805, 808 (C.A. 8, 1960),

and United States v. Tateo, 214 F.Supp. 560, 564 (S.D.N.Y., 1963). Assuming arguendo that the relator's guilt is of some relevance here, however, his failure to offer a defense to the charges levelled against him is of no significance in view of his lack of knowledge of what those charges were. Indeed, in retrospect, it seems likely that the relator did have defenses to these charges. It is at least arguable that the relator's alleged activities in improperly proceeding from one part of the prison to another do not legally constitute "prison breach" in violation of Title 18 P.S. § 4309 and, further, that the facts as established on the present record are not such as to constitute the type of coercion or enticement contemplated by the language in Title 18 P.S. § 4723.1.

Not only does the weight of relevant evidence indicate that the relator did not exercise "knowing" judgment requisite to entering a valid guilty plea, but, in addition, the Commonwealth has not proven to the satisfaction of this Court that the relator pled guilty to the charges directed against him "voluntarily", i.e., because of a " * * * considered choice * * * free of any factor of inducement which has unfairly influenced or overcome his will." United States ex rel. Elksnis v. Gilligan, 256 F. Supp. 244, 253 (S.D.N.Y., 1966). In arriving at this conclusion this Court has not adopted those portions of the relator's testimony which suggest that the prison authorities and other prosecuting authorities involved in this case in fact coerced and threatened him. These persons creditably and consistently testified to the absence of such an atmosphere. The controlling factor, here, however, is not whether *in fact* threats or coercion were directed at the relator, but rather, whether he believed that they were:

> "If, at the time he pled guilty, the defendant believed that a coercive promise or threat had been made either by the court or the prosecutor, though in fact no such promise or threat had been made, and his plea was induced by this belief, it is an involuntary and

void plea. This conclusion necessarily follows from the fact that voluntariness connotes a state of mind of an actor. If the actor—i.e., the defendant—believes that a promise has been made, the effect on his state of mind is exactly the same as if such a promise had in fact been made. Thus, any test of whether a person acts voluntarily is necessarily 'subjective' ", *Mancusi*, supra, 275 F.Supp. at 516.

During the critical two weeks between his attempted escape and the September 26th Sentencing Hearing relator was involved in a hectic sequence of judicial and extra-judicial proceedings. See, supra, p. 266. The totality of these circumstances not only was such as to render impossible the entry of a knowing plea of guilty by this disturbed, highly emotional defendant, but was such as to necessarily render his making of any theoretically binding legal decision, such as a plea of guilty, legally "involuntary". Accordingly, the relator's petition for a writ of habeas corpus is granted.