**UNITED STATES of America ex rel. William SMITH**

v.

**Robert L. JOHNSON, Superintendent, and District Attorney of Philadelphia.**

**Civ. A. No. 73–2666.**

United States District Court, E. D. Pennsylvania.

Nov. 24, 1975.

Arthur L. Pressman, Philadelphia, Pa., for relator.

Bonnie B. Leadbetter, Philadelphia, Pa., for respondents.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a petition for a writ of habeas corpus brought by a state prisoner who is presently serving a sentence of six to thirty years' imprisonment following his plea of guilty to three counts of aggravated robbery and one count of burglary before the Honorable Emanuel W. Beloff of the Court of Common Pleas of Philadelphia County on May 24, 1972.[1] Relator, represented by new counsel, appealed his conviction to the Superior Court of Pennsylvania, alleging that the plea was involuntarily and unintelligently entered and that he had received ineffective assistance of counsel. On May 17, 1973, the Superior Court affirmed relator's conviction without opinion. *Commonwealth v. Smith*, 225 Pa.Super. 745, 306 A.2d 375 (1973). The Supreme Court of Pennsylvania denied a petition for allocatur on October 10, 1973.

Relator's pro se petition to this court asserted claims of ineffective assistance of counsel and involuntariness of the guilty plea relating to the unpreparedness of trial counsel, Harvey Booker, Esquire, of the staff of the Philadelphia Defender Association. The case had originally been assigned to William Killeen, Esquire, another Public Defender. Although Mr. Killeen was familiar with relator's case and was prepared for trial, the case was reassigned to Mr. Booker on the morning of trial because Mr. Killeen was detained in another courtroom on another case.

The Commonwealth's answer set forth excerpts from the transcript of the guilty plea hearing. Those excerpts exposed the fact that, in receiving the plea, Judge Beloff neglected to inform relator of the maximum sentence which might be imposed. In view of the obvious constitutional problem which such an omission created,[2] United States Magistrate Edwin E. Naythons (to whom the petition was first referred upon its filing in this

---

1. Respondent Robert L. Johnson was the superintendent of the State Correctional Institution at Graterford, Pennsylvania, at the time of the filing of this petition.

2. *United States ex rel. Crosby v. Brierly*, 404 F.2d 790, 794–96 (3d Cir. 1968). See *Roberts v. United States*, 491 F.2d 1236 (3d Cir. 1974); *cf. Machibroda v. United States*, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927).

**1384**

court) recommended that we hold an evidentiary hearing to determine whether relator, through some other advice, was aware of the possible consequences of his plea prior to the entry thereof. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Magistrate Naythons also recommended that evidence be taken on the claim of ineffective assistance of counsel. We thereupon appointed Arthur L. Pressman, Esquire, as counsel for relator and held a two day hearing.

The evidentiary hearing produced a metamorphosis of petitioner's claim. As will be seen, the Commonwealth amply demonstrated that relator knew the possible consequences of his plea, by virtue of a conversation with James Bryant, the Assistant District Attorney assigned to prosecute the case. However, the content of that conversation was so bizarre that it raised further questions as to possible prosecutorial overreaching and, thus, the voluntariness of the plea. We took extensive evidence on the subject of that conversation and on the subject of ineffective assistance of counsel.[3] We also took notice (and now take notice) of the state court record, for that forms an essential part of our record here.

It will be helpful, before summarizing the applicable law and making our findings of fact and ultimate determination, to detail the applicable portions of the record. As will be seen, while we condemn the conduct of the prosecutor in this case, we do not find that relator was deprived of the effective assistance of counsel or that his plea was involuntary. Hence, relief must be denied.[4]

3. We also requested that the parties brief these points in light of the additional evidence adduced at the hearing.

4. Before turning to the substance of the factual and legal issues presented, we must consider the Commonwealth's claim that relator failed to exhaust state remedies available to him. Under 28 U.S.C. § 2254(b), the exhaustion of state remedies is required whenever the petitioner is in state custody "pursuant to the judgment of a State court . . . ." Smith's case has been before the highest court of Pennsylvania. Accordingly, he need not also seek collateral state relief on the same issues for federal habeas corpus remedies to be available. *Brown v. Allen*, 344 U.S. 443, 448–49 n.3, 73 S.Ct. 397, 97 L.Ed. 469 (1953); *United States ex rel. Bennett v. Rundle*, 419 F.2d 599 (3d Cir. 1969). The commonwealth suggests, however, that the present petition raises new issues not presented to the Superior Court of Pennsylvania or the Pennsylvania Supreme Court. We must reject the Commonwealth's position for three reasons.

First, Magistrate Naythons' and our own study of the briefs submitted by relator's counsel in the Supreme and Superior Courts of Pennsylvania lead us to believe that these issues were necessarily before those courts. The briefs disclose that the following questions were presented:

 (a) Is it a fact that the guilty plea was not voluntarily and intelligently entered?
 (b) Did defendant receive ineffective assistance of counsel?

Moreover, at page 3 of petitioner's brief in the state appellate courts, it is stated:

 (c) The attending circumstances of this case clearly indicate reasons why Defendant decided to plead guilty to the charges. The record points to the fact that a Mr. Killeen of the Public Defender's Association was planning to handle this case but was unavoidably detained because of another trial. This meant that Mr. Booker, also a Public Defender, without having a good and adequate opportunity to talk with Defendant and prepare notes from the file, was placed in a situation by the trial judge where he had to promote a cognizable defense. The only apparent reason for the judge's insistence that Mr. Booker handle the case was because of the inconvenience to several witnesses. Mr. Booker related on-the-record that his colleague should handle this matter. A note to that effect was situated on the file. The trial judge, however, insisted that Mr. Booker try the case without delay.

Second, what emerged as the most significant aspect of relator's case did not come to anyone's consciousness until the midst of the hearing before us. Finally, because we have found that none of relator's claims warrants relief, the principles of federalism and comity do not dictate that we send the relator back to state court for a hearing on issues that we are prepared, after our own hearing, to resolve against him. See *United States ex rel. Kelly v. Maroney*, 414 F.2d 1228 (3d Cir. 1969).

## II. *The Facts of Record*

### A. *The Plea Hearing before Judge Beloff*

At the guilty plea hearing on May 24, 1972 before Judge Beloff, relator was represented by Harvey S. Booker, Esquire, of the Philadelphia Defender Association; James J. Bryant, Esquire, then an Assistant District Attorney, represented the Commonwealth. The plea hearing consisted of relator's testimony and the testimony of Irving Swann, Horace Money and Officer Dennis Lane (to provide the factual basis for relator's plea). The testimony may be summarized as follows.

Relator was questioned by Mr. Booker and Judge Beloff regarding the intelligence and voluntariness of his plea. Comm.N.T. 3–6.[5] During the colloquy that ensued the court asked Mr. Booker whether he had advised his client of his right to a jury trial. Booker answered in the affirmative. At this juncture, Mr. Booker questioned relator on the record as follows:

BY MR. BOOKER:

Q. Mr. Smith, how old are you?

A. Thirty-three.

Q. How far did you go in school?

A. The eleventh grade.

Q. Can you read and write the English language?

A. Yes.

Q. Do you understand today by entering a guilty plea you forego your privilege of a jury trial?

A. Yes.

Q. That the guilty statement of the jury must be made by the twelve jurors unanimously?

A. Yes.

Q. You also are aware of the fact that you could be tried by the Judge?

A. Yes.

Q. There is no question about that?

A. No.

Thereafter, Judge Beloff questioned relator on the record as to whether his lawyer or the District Attorney had made any threats or promises of any kind. Relator answered both queries in the negative. In response to further questioning by Judge Beloff, relator informed the court that he was unemployed at the time of the robberies but had held the position of a non-teaching assistant at the Bok Vocational School for a year sometime prior to the events leading up to his trial.[6] At no time did the court or Mr. Booker inform relator or ask relator if he was aware of the maximum sentence which might be imposed on his plea of guilty. Rather, Judge Beloff, after conducting a further examination into relator's ability to meet the job qualifications for a non-teaching assistant, announced his decision to arraign the defendant.

In testimony adduced to provide the factual basis for relator's guilty plea, Irving Swann, the night bartender and manager of the Most Complete Bar, 2148 Ellsworth Street, Philadelphia, testified that on the evening of November 1, 1971, relator and two other individuals entered his bar and robbed him of approximately $48.00. Mr. Swann testified that relator, whom he had known for fifteen years, held an instrument of some sort with which he threatened to shoot Mr. Swann. Comm.N.T. 9–12. Horace Money, the day bartender at the Most Complete Bar, testified that during the afternoon of November 8, 1971, relator again held up this bar. Relator, whom he had served as a customer on numerous oc-

---

5. Notes of testimony of the proceeding in the state court are designated "Comm.N.T.". Notes of testimony of the evidentiary hearing before this court are designated simply "N.T.".

6. Mr. Booker informed the court at the time of the guilty plea hearing that a non-teaching assistant patrols the school to maintain order among the students.

casions, had an accomplice and struck Mr. Money over the head. Comm.N.T. 18–19. Mr. Swann testified that relator returned to the Most Complete Bar on the evening of November 8, 1971, and again attempted to rob him. According to Swann, relator was again holding an instrument, which appeared to Mr. Swann to be a gun wrapped in a newspaper,[7] and again threatened to shoot him. Mr. Swann handed over $25.00 to relator. When relator reached into the cash register, Mr. Swann knocked the instrument from his hands and proceeded to subdue him. Officer Dennis Lane responded to a call to the police and made the arrest.

### B. *The Salient Evidence Adduced at the Hearing Before This Court*

(1) *Relator's Knowledge of the Maximum Potential Sentence (The Bryant Conversation)*

As we have noted above, one reason for scheduling an evidentiary hearing in the matter was to determine whether relator had been advised as to his possible jeopardy by reason of a guilty plea. The testimony on this subject from James Bryant, the Assistant District Attorney assigned to Judge Beloff's courtroom,[8] supplied the missing link. It did so in such an utterly bizarre fashion, however, that it created other problems. While we ordinarily eschew verbatim excerpts from transcript, no summary would do Mr. Bryant's testimony justice:

BY MR. BRYANT:

So I walked over. I said, do you mind if I talk to the defendant?

And he said, no.

So Harvey [Booker, the relator's trial counsel] was there and the defendant was there.

\* \* \* \* \* \*

I said to the defendant, do you want a jury trial?

And he said, yes, I do.

I said, that is fine with me.

He said, what is this judge like?

I said, well, if Judge Beloff is in a bad mood, you are going to be up the creek for sixty years.

He said something about, man, that is some pretty heavy time. How do you get that kind of time?

I said, well, you are in for three counts of robbing the same bar and that is sixty years, in my book.

And he asked Harvey about that, and Harvey said that was sixty years.

Then there was a discussion about a burglary bill, and I told him the burglary bill was so much b. s., that it was just an instance of overindicting by a grand jury and it didn't make or break the case.

The defendant asked me what he should do, and I told him it wasn't my position to tell him. I said, it is up to you. I said, you are facing some pretty heavy time. There was at this point a jury panel on its way in. And I said, I really don't care. So I left.

. . .

\* \* \* \* \* \*

BY THE COURT:

Q. And in haec verba, as best you can recall, you said what?

A. I told him he would be up the proverbial creek, only I didn't use those words, without a paddle.

Q. You told him he would be up s. creek without a paddle?

A. For sixty years.

He said, man, that is some heavy f. time.

And I said, you better believe it, but I didn't do the robbery.

He said, well, what should I do?

I told him I didn't know. That was up between him and his attorney. I was ready to try it.

---

7. The instrument turned out to be two sticks wrapped in newspaper.

8. Mr. Bryant has withdrawn from the practice of law and is now a farmer in Centre County, Pennsylvania.

Q. What did sixty represent?

A. Three times twenty, the maximum for ag. robbery, which nobody gets in Philadelphia.

N.T. 41–42, 52. Mr. Bryant further testified to the presence of Mr. Booker during the conversation with relator set forth above.[9] Although he admitted that such a colloquy between a defendant and a prosecutor is extremely unorthodox, N.T. 52, he clearly stated his motivation for such an encounter at the hearing:

BY MR. PRESSMAN:

Q. I thought you told me that it was generally unusual for a D. A. to talk to a defendant?

A. Sure, but if it will help to move cases or blackjack pleas, I would walk across glass.

\* \* \* \* \* \*

I was a little bit unorthodox and talked to them [defendants] as often as I could in an effort to speed up the list. And defendants, as you know, come into court looking for a friend, looking for somebody that might know. He wanted to find out what was going to happen to him, and I told him.

Mr. Bryant's testimony as to the conversation was controverted by that of relator and his two witnesses, Mary Spain (relator's sister) and Charles Jackson, each of whom stated that such a conversation never took place. N.T. 71, 98, 99–100. Mr. Booker's testimony on this point supplied nothing, as he had no independent recollection of most of the facts surrounding relator's case, including the occurrence *vel non* of such a conversation. N.T. 77–79, 90, 92.

(2) *The Question of Effective Assistance of Counsel*

Relator was represented at the various stages of the criminal proceeding against him by lawyers on the staff of the Defender Association of Philadelphia. Relator's preliminary hearing was held before Judge William Markert of the Philadelphia Municipal Court on November 18, 1971, approximately ten days after relator's arrest and approximately six months before he pleaded guilty. Mr. McIntyre of the Defender Association represented relator at the preliminary hearing, where the Commonwealth's only witnesses, the two bartender complainants, both testified and were cross-examined. Their testimony was essentially the same at that hearing as at the time of relator's guilty plea. (*See* Part II.A. *supra*). Additionally, relator discussed his case with Mr. McIntyre at that time. N.T. 20–21. Later, while relator was awaiting trial, he was interviewed by an investigator from the Defender Office. N.T. 5. As a result of this pre-trial preparation, two defense witnesses were subpoenaed and appeared in relator's behalf on the day the case was listed for trial. The next time relator saw someone from the Defender Association was on the morning of his trial before Judge Beloff. N.T. 11. At that time, he met

---

9. BY MR. PRESSMAN:
Q. Was Mr. Booker a participant in your conversations with Mr. Smith?
A. He was there.
Q. He was there within ear range?
A. Tables that size, the defendant was seated, Harvey was standing, and I was standing or maybe crouched or sitting on the table myself.
BY THE COURT:
Q. When you had your conversation with Mr. Smith, it was in the presence of defense counsel and they were seated around the table?
A. Mr. Booker was standing up.
Q. You went over and either stood or sat on the table?

A. It is laid out not like this room, because this room, to say the least, is unusually shaped for a courtroom. It is a square courtroom with counsel table side by side and the D.A. next to the jury, and I walked over and said, can I talk to him?
And he said, yes.
BY MR. PRESSMAN:
Q. When you came over and asked Mr. Booker, can I talk to Mr. Smith?, did Mr. Booker respond to you at all other than him saying yes or no? What was his reaction to that?
A. Something like, sure, go ahead. Harvey and I had a good working relationship.
N.T. 59, 64.

Mr. Booker, whose first contact with either relator or his case was on the day of the plea. Mr. Killeen, also of the Defender Association, had been assigned to relator's case and was prepared to try it but was unavoidably detained because of another trial.

According to former Assistant District Attorney Bryant, Mr. Booker and relator first met about an hour and a half prior to commencement of the proceedings before Judge Beloff. The testimony regarding the amount of time Mr. Booker actually spent with his client varied markedly. Mr. Booker himself had no independent recollection of the events of relator's case. According to relator and his witnesses, Mrs. Spain and Mr. Jackson, Mr. Booker spent five to ten minutes at most discussing the case with relator prior to Judge Beloff's entrance into the courtroom. Smith, N.T. 12; Jackson, N.T. 96; Spain, N.T. 99. According to Mr. Bryant, Mr. Booker spent approximately fifteen to twenty minutes speaking to relator prior to the time that Judge Beloff entered the courtroom. Mr. Bryant testified that while Mr. Booker was talking with the defendant, Mrs. Spain was called over. Thereafter, according to Mr. Bryant, Mr. Booker walked over to Mr. Bryant and told him that it would be a jury trial, at which point Mr. Bryant asked for and was granted permission by Mr. Booker to speak to relator. Mr. Bryant added that after this conversation, which took two to three minutes, Mr. Booker again consulted with relator and his family for approximately ten or fifteen minutes.[10]

During the course of his conference with relator, Mr. Booker saw, apparently for the first time, the Defender Association file, which contained the investigator's report. Mr. Bryant also permitted him to see the District Attorney's file. Assessing relator's situation, Mr. Booker advised his client to plead guilty. Relator's account of this conversation is set forth below:

A. . . . So after he ran through the files, the records, and what not, he told me there was a question of a spring [sprain] or a break.

Q. Did he explain what that meant?

A. He told me that it didn't look too good.

Q. And did he suggest that you do anything?

A. He told me to plead guilty. Advised me of it.

N.T. 16–17. Judge Beloff then entered the courtroom, and the attorneys addressed the bench. It is this colloquy, repeated in full below, that relator contends presents the strongest evidence of Mr. Booker's unpreparedness to represent him.

MR. BRYANT: Your Honor, the Commonwealth moves for trial in the case of William Smith. Both bartenders are here in pursuance to your Honor's instruction.

THE COURT: Very well.

MR. BOOKER: I am Harvey Booker, from the Public Defender's Office. Mr. Killeen, an attorney from our office, is across the hall. He prepared the case. He is on trial across the hall at this time and I do not know how long he will be.

THE COURT: Do you want to talk to your client and look at the folder for a while?

10. At the hearing before us, relator stated that Mr. Booker had told him that he (Mr. Booker) did not know what Mr. Killeen had planned in preparation of the case. N.T. 27. However, according to Mr. Bryant's testimony, Mr. Killeen did come into the courtroom to confer with Mr. Booker at least once during the proceedings and prior to the time that Mr. Booker informed the court that there would be a plea. N.T. 40. Mr.

Bryant further testified that, although he had been informed that relator's case was assigned to Bill Killeen, "it was the classic earmarks of a duck job." He stated to the court that "they could have assigned it to the office boy or said that. They just wanted to do anything to keep a case from going to Beloff . . . . I can't blame him." N.T. 56–57.

MR. BOOKER: I have. I have talked to him and I don't know what outside preparation was made.

THE COURT: I have had your people come in here many, many times with a folder and say, "I am ready to proceed."

There is not a lot on the front to indicate that this is too much of a case, Mr. Booker.

MR. BOOKER: Well, on the front of my file there is a note indicating that Mr. Killeen prepared the matter and he was the person who prepared to handle it. I cannot say why that note is here.

THE COURT: If you want some time to talk to your client, you may do so. This case has been fooled around with now since yesterday.

I cannot bring a group of people in here day after day and have them ready and then waste their time.

MR. BOOKER: We will proceed, your Honor.

Relator testified that, following this colloquy, Mr. Booker again spoke to him at counsel table. This conference, according to relator, lasted "a very short while," i. e., less than ten minutes. Subsequent to this conversation, relator accepted Mr. Booker's advice to plead guilty.[11] After the acceptance of relator's guilty plea by the court, Mr. Booker called two witnesses on relator's behalf on the issue of sentencing. After a nine to forty-five year sentence was pronounced, Mr. Booker—with the aid of Mr. Bryant—was able to persuade Judge Beloff to reduce the sentence by one-third. N.T. 43.

We also adduced evidence about Mr. Booker's experience in the trial of crim-inal cases. It appeared that at the time of trial, Mr. Booker was assigned to the major trial division of the Defender Office, where he handled predominantly rape and robbery cases. Mr. Booker testified that at the time of relator's trial, he had been in practice for approximately twelve years, during which time he had handled in excess of 500 criminal cases. Most of his twelve years in practice had not been with the Defender Association, which he joined in September 1971 (approximately eight months prior to the time of relator's guilty plea), but rather in a private practice consisting largely of criminal defense work.

### III. *Findings of Fact*

In view of the manner in which the contours of the case had been altered by Mr. Bryant's testimony, and so that the posthearing briefs of the parties would be pointed towards the issues which we perceived to be viable in the wake of the hearing, we announced at the conclusion of the hearing several findings of fact.

(1) We credited Mr. Bryant's testimony in full with respect to the conversation that he had with relator. Concomitantly, we rejected the testimony of Mary Spain, Charles Jackson, and relator that there was no such conversation.

(2) We found that relator was advised by Mr. Bryant of the maximum sentence that he might face, but we noted that the manner in which the advice was transmitted was "shocking."

(3) We also found that Mr. Booker acted with utter passivity in the face of Mr. Bryant's patter.

---

11. There exists some confusion in the testimony on this point. At the hearing, relator testified that Mr. Booker advised him to plead guilty prior to this second conversation with relator at counsel table. N.T. 17. However, Mr. Bryant testified that after the judge entered the courtroom, Mr. Booker advised him it would be a jury trial. According to Mr. Bryant, it was after that time that Mr. Booker came over to him and asked what he would do in the event of a plea. Mr. Bryant testified that he stated that "I wouldn't do a thing except keep my mouth shut and let the chips fall where they may." Mr. Bryant testified that there was more discussion and that, at that juncture, Mr. Booker told the judge there would be a plea. N.T. 43.

We remain satisfied that these findings are sound, and we reconfirm them. While these findings, subject to the discussion below, effectively dispose of relator's claim that his guilty plea was rendered involuntary by the court's failure to inform him of the maximum sentence he might face, they do not dispose of relator's remaining claims: (1) the claim emerging from the hearing that his plea was rendered involuntary by Mr. Byrant's conduct; and (2) ineffective assistance of counsel.

On the former claim, we have credited Mr. Bryant's recitation of the conversation. His memory was most remarkable; his demeanor was as convincing as it was cynical (if not brazen). We also make certain additional findings. First, although Mr. Bryant's motives and conduct were deserving of severe criticism, everything that he told relator in the presence of relator's counsel was the truth. He did not mislead him, nor did he do anything other than lay out the facts, including his judgment as to the sentencing philosophy of the trial judge, who was apparently unwilling to continue the case, even though relator's assigned trial counsel was unavailable. While he did not do so in the manner that a judge would have, he did inform relator of what penalty the charges might carry. Second, we find that the ultimate decision as to whether to plead was expressly reserved to relator with the advice of counsel. Mr. Bryant did not coerce relator. Finally, we find that relator's decision to plead guilty was not the result of Bryant's actions but rather of his counsel's advice, his realization of the strength of the cases against him (there being several strong identification witnesses to his three robberies over a one week period of the same tavern), his unhappiness with trial counsel's preparation in the case and the decision of the trial judge to deny a continuance.

With respect to the second remaining claim (ineffective assistance of counsel), most of the facts recited in Part II.B.(2) above are not in dispute. In any event, we find that:

(1) Relator was represented by the Defender Association of Philadelphia since the date of his preliminary hearing held before Judge Markert on November 18, 1971. The Defender Association's investigative staff had also investigated the case.

(2) Mr. Killeen was assigned to handle relator's trial but was unavoidably detained in another courtroom. As a result, Mr. Booker was assigned to relator's case, and he was required to pursue it to resolution in view of Judge Beloff's unwillingness to continue the matter.

(3) Mr. Booker's first contact with either relator or his case was on the day of relator's plea. Prior to the time that Judge Beloff entered the courtroom, Mr. Booker spent approximately fifteen to twenty minutes speaking to relator, during which time he also read the D.A.'s and the Defender's file on relator's case. He also conferred briefly with Mr. Killeen. It was during this period that the conversation that Mr. Bryant testified to occurred. Mr. Booker was a participant in Mr. Bryant's conversation with Mr. Smith, which took two to three minutes. After that conversation, Mr. Booker spent additional time with relator and his family discussing relator's case. Moreover, following Judge Beloff's entry into the courtroom, Mr. Booker was given a further opportunity to confer with his client, which Mr. Booker did. There followed a five or ten minute discussion between Mr. Booker and relator at counsel table.

(4) Mr. Booker was experienced in the handling of major criminal trials. Although we have found that Mr. Booker was passive during the Bryant conversation, we also find that his advice that relator plead guilty was a product of his experience and his review of the evidence, which he found to be overwhelming.

## IV. Discussion

### A. Introduction

It is well settled that an accused's plea of guilty, like any surrender of fundamental constitutional rights, satisfies the due process clause of the Fourteenth Amendment only if made intelligently and voluntarily. *Machibroda v. United States*, 368 U.S. 487, 82 S.Ct. 510 (1962); *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582 (1927). The plea must reflect the considered choice of the accused, free of any factor or inducement which has unfairly influenced or overcome his will. A guilty plea that is induced by coercion, promises, or is otherwise unfairly obtained or given through ignorance of the consequences, fear or inadvertence is inconsistent with due process of law. Moreover, the importance of assuring that a defendant does not plead guilty except with a full understanding of the charges against him and the possible consequences of his plea was at the heart of *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). *Boykin* added the requirement that the record must affirmatively disclose that a defendant who pleaded guilty entered his plea voluntarily and understandingly.

The colloquy entered into between Judge Beloff, Mr. Booker and relator at the time of the taking of relator's plea (*see* Part II.A. *supra*) was sufficient for the judge to ascertain: (1) that relator's plea was not induced by threats or promises of any kind; (2) that he was aware of the nature of the charges against him; and (3) that he was aware of his right to trial by jury.[12] Although the court itself did not personally direct all the questions to the relator, but instead was aided by the participation of Mr. Booker, this procedure does not violate the mandate of *Boykin*. See *Davis v. United States*, 470 F.2d 1128 (3d Cir. 1972).[13]

12. The colloquy shows that the defendant, at the time of the taking of the plea, was aware that he was giving up his right to have his guilt or innocence decided by a jury or, alternatively, by a judge sitting alone. He understood that at a trial the Commonwealth would have to prove his guilt beyond a reasonable doubt on each charge to each juror. *Boykin*, *supra*, enumerated three constitutional rights which are waived by a plea of guilty—the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. But the Court of Appeals for the Third Circuit has held that at the time the plea is entered, if the court has satisfied itself that it is made knowingly and voluntarily, due process does not require express articulation of the constitutional rights that are waived by entry of the plea. *Davis v. United States*, 470 F.2d 1128, 1132 (3d Cir. 1972).

13. *Boykin* does not posit a rigid rule fastening the prophylactic requirements of Fed.R. Crim.P. 11 on the States. Rule 11 requires that in federal court a judge "[address] the defendant personally" to determine the voluntariness of a plea, and it must be literally complied with in cases where it applies. *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Even as to federal pleas, however, *McCarthy* is not retroactive. *Halliday v. United States*, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969). Thus, in *Davis*, where a federal prisoner challenged his pre-*McCarthy* plea, the Third Circuit applied a standard similar to (and certainly no less stringent than) the constitutional standard we must apply in the case at bar. *Davis* held that a guilty plea was not void where the prosecutor, rather than the judge, addressed some of the critical questions to the defendant in open court at the time of entry of the plea. Judge Rosenn held that this procedure did not defeat the objective of Rule 11 that the court have adequate response from the defendant himself. Moreover, stated Judge Rosenn, the error that was fatal in *McCarthy* was not the *court's* failure to pose the relevant questions, but that the record did not show they had been posed at all. *Davis* thus seems relevant here, for what does not offend the supervisory rule surely does not violate the constitution. The court's concern in *Boykin* was to insure that the judge "[canvass] the matter with the accused to make sure that he has a full understanding of what the plea connotes and of its consequences." 395 U.S. at 244, 89 S.Ct. at 1712. That someone other than the judge directs the inquiry has little bearing on this determination.

B. *Was Relator Adequately Informed of the Punishment for the Crimes with which he was Charged Prior to the Entry of the Guilty Plea?*

■ It is well settled that prior to the entry of the guilty plea, a defendant should be advised of the consequences of that plea, including the maximum sentence which may be imposed on a plea of guilty.[14] As was noted earlier, the record shows that the court did not advise relator of the maximum sentence which could be imposed upon entry of his plea of guilty. However, we have found that Mr. Bryant informed relator that he faced a possible sentence of sixty years. This conversation provided him sufficient knowledge of the consequences of his plea to meet the constitutional minimum standard of *Boykin.* See, e. e., *Todd v. Lockhart,* 490 F.2d 626 (8th Cir. 1973) ;[15] *Wade v. Coiner,* 468 F.2d 1059 (4th Cir. 1972).

■ ■ The one remaining question in this area is whether a warning of a possible sixty year term suffices where there is a possibility that the maximum term[16] could have been as much as eighty years.[17] While Fed.R.Crim.P. 11 may set a higher standard where it ap-

14. *Wade v. Wainwright,* 420 F.2d 898 (5th Cir. 1969) ; *Pilkington v. United States,* 315 F.2d 204, 208–09 (4th Cir. 1963). See *Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948) ; *Roberts v. United States,* 491 F.2d 1236 (3d Cir. 1974).

15. In *Todd v. Lockhart,* 490 F.2d 626 (8th Cir. 1974), Todd had pleaded guilty to second degree murder in the state court. The transcript of the plea showed that Todd was asked essentially two questions by the trial judge. Todd was first asked whether he was guilty. To that question, he responded in one word, "guilty." Todd was then asked whether he was acquainted with meritorious and statutory good time; he responded that he was aware of these provisions. The court then accepted the plea. Subsequently, Todd sought relief from his plea by way of state post-conviction procedures. After an evidentiary hearing, Todd's contentions were found to be without merit and relief was denied. Todd then sought relief in Federal Court. Recognizing that *Boykin's* mandates had not been complied with, the Federal District Judge, on the basis of the state post-conviction record, determined that Todd's plea was both voluntary and intelligent. Todd appealed and the Court of Appeals posited the issue as being whether an otherwise defective plea-taking record could be cured by a record developed in either a state post-conviction proceeding or in a federal post-conviction proceeding, and if so, whether the record in that case demonstrated that the plea was both voluntary and intelligent. Noting that *Boykin,* unlike *McCarthy* (which dealt with a question similar to the *Boykin* issue but in terms of the Court's supervisory power in relation to Fed.R.Crim.P. 11), did not specifically indicate that every plea of guilty should be automatically vacated when the precepts of *Boykin* were violated, the Court of Appeals held that a state or federal post-conviction hearing may cure an otherwise defective plea-taking transcript. See, e. g., *McChesney v. Henderson,* 482 F.2d 1101, 1109 (5th Cir. 1973) ; *Walker v. Caldwell,* 476 F.2d 213, 215–16 n. 1 (5th Cir. 1973). Even if we were to assume that the absence of the trial court's inquiry regarding maximum penalties is violative of *Boykin,* it is not necessary to vacate the plea on this ground since the evidence, gleaned at our own evidentiary hearing, was that petitioner was advised of the maximum penalty for the crimes with which he was charged.

16. Under Pennsylvania Law at the time relator was sentenced, the minimum term fixing parole eligibility could be no more than one-half the maximum term.

17. Mr. Bryant testified that he told the relator he could be sentenced to sixty years' imprisonment on the three aggravated robbery charges. He viewed the burglary count as an example of "overindicting" and apparently believed that the counts merged. Bonnie B. Leadbetter, Esquire, counsel for the Commonwealth in the proceeding before us, has taken the position that the burglary and robbery counts do not merge and that relator could have received a sentence of eighty years on the burglary and three aggravated robbery counts, although the burglary charge arose from the same incident that comprised one of the aggravated robbery charges. However, she has also stated that there is a general practice of suspending sentence on collateral burglary bills where there is a conviction on the substantive offense. N.T. 55. In her brief, Mrs. Leadbetter noted that she could discover no cases discussing the issue of whether the burglary charge would merge into one of the robbery counts but relied upon the general rule that there is no merger if each crime embraces at least one element distinct from the elements of the other. *Commonwealth ex rel. Moszczynski v. Ashe,* 343 Pa. 102, 106, 21

plies (*see* note 13 *supra*), a substantial body of caselaw indicates that the constitution requires only that the accused understand the seriousness of the charges to which he is pleading and approximately the sort of penalty he may face. See, *e. g.*, *United States v. Blair*, 470 F.2d 331, 340 n. 20 (5th Cir. 1972), *cert. denied*, 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 197 (1973); *McDonald v. Kropp*, 373 F.2d 549, 558–59 (6th Cir. 1967); *Verdon v. United States*, 296 F.2d 549, 553 (8th Cir. 1961) (Blackmun, J.). Simply stated, the purpose of the requirement that the defendant be warned of the possible consequences of his plea is to insure that no defendant will give up the panoply of rights accompanying trial without understanding the sort of trouble he may be getting himself into. Such an understanding was manifestly present in the instant case.

██ ██ At the time his plea was entered, relator was approximately thirty-four years old. The difference between a possible maximum sentence of sixty years and one of eighty years could hardly have altered his decision whether a plea was in his best interests. What is important in satisfying constitutional standards is relator's awareness that he faced a *very* substantial prison term. Any claim to the contrary is muted by the fact the relator was no novice in the

criminal process; the state court record reflects prior convictions for both robbery and burglary. Finally, and of equal importance, since the sentence imposed was six to thirty years, the maximum portion imposed being only one-half that which he was told he faced, the error of stating sixty rather than eighty years was not prejudicial.[18] Accordingly, on the claim which emerged from the facially inadequate plea hearing colloquy, relator is not entitled to relief.[19]

**C. Was Relator's Plea a Knowing and Intelligent Act Entered With the Effective Assistance of Counsel?**

██ A habeas corpus petitioner seeking collateral relief from a counselled state court guilty plea "is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act." *McMann v. Richardson*, 397 U.S. 759, 774, 90 S.Ct. 1441, 1450, 25 L.Ed.2d 763 (1970). Phrased differently:

> Whether a plea of guilty is unintelligent and therefore vulnerable . . . depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence

A.2d 920 (1941); *Commonwealth v. Cox*, 209 Pa.Super. 457, 465, 228 A.2d 30 (1967). Since the statutes applicable to this case defining burglary (18 P.S. § 4901) and robbery (18 P.S. § 4705) each include elements lacking in the other, there would appear theoretically to be no merger, although as a practical matter there would appear to be because of the remoteness of so harsh a sentence.

18. There are a number of cases, clearly distinguishable, dealing with the obverse of the present situation, *i. e.*, erroneously informing the defendant of a greater maximum sentence than that which the law countenances. In *Kelsey v. United States*, 484 F.2d 1198 (3d Cir. 1973), relying not on the constitutional principles that apply here but on Fed.R.Crim.P. 11, the court held that such

misinformation vitiates the plea. Other courts have held that so long as the consequences which actually result from the plea are no more dire than those the defendant has been led to believe may ensue, the law allows an evaluation of whether the misinformation induced a plea which would not have been entered had the defendant known the actual maximum penalty. *See, e. g.*, *Schofield v. United States*, 441 F.2d 1219 (7th Cir. 1971); *United States v. Woodall*, 438 F.2d 1317 (5th Cir.), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971); *Murray v. United States*, 419 F.2d 1076 (10th Cir. 1969).

19. There has been no allegation (and certainly no evidence) that the sixty versus eighty year error was intentional and designed to coerce relator.

demanded of attorneys in criminal cases.

*Id.* at 770–71, 90 S.Ct. at 1448. In this respect, our examination "resolves into a determination whether [relator] received the effective assistance of counsel in reaching the decision to plead guilty." *United States ex rel. Broaddus v. Rundle,* 429 F.2d 791, 793 (3d Cir. 1970). The burden is upon relator to show that his plea was not intelligently entered and that in advising the guilty plea counsel exhibited a lack of normal competency. See *United States ex rel. Watson v. Lindsey,* 461 F.2d 922 (3d Cir. 1972); *United States ex rel. Felton v. Rundle,* 343 F.Supp. 938 (E.D.Pa.1972); *United States ex rel. Jones v. Russell,* 320 F.Supp. 1028 (E.D.Pa.1970). "Counsel's failure to evaluate properly facts giving rise to a constitutional claim, or his failure properly to inform himself of facts that would have shown the existence of a constitutional claim," plays a part in evaluating the advice rendered by counsel and may aid relator in meeting this standard of proof. *Tollett v. Henderson,* 411 U.S. 258, 266–67, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973).

■ In the present case, neither in his own testimony nor in counsel's brief, is relator able to point to any serious derelictions on the part of counsel in advising the plea. Indeed, reviewing the circumstances in the present case, there were several compelling grounds which supported counsel's advice to relator to enter a plea of guilty. Counsel was faced with a case in which the evidence against his client was overwhelming. Relator had robbed the same bar on three occasions within the space of one week. He was well known to both of the bartenders

held up: one had served him as a customer on approximately twenty-five prior occasions; the other had known him for fifteen years. Comm.N.T. 16, 19–20. During the third holdup, the bartender managed to subdue relator and hold him until the police came. These witnesses were present in court and available to testify. It is clear that they could identify him. Moreover, on the basis of two interviews (one at the preliminary hearing by an attorney from the Defender Association and the other at prison by an investigator), the Defender Association was able to subpoena only two defense witnesses, both of whom could testify only to matters pertinent to sentencing. In this situation (and after having been denied a continuance by Judge Beloff, whom he was trying to avoid because of the Judge's "tough" reputation), Mr. Booker informed relator that "'it didn't look too good" (N. T. 16–17) and, therefore, advised a guilty plea. The record shows that the recommendation was based on counsel's weighing the strength of the evidence against his client, the reasonable likelihood of a reduced sentence in the event of a guilty plea, and the inability to avoid presenting relator's case before Judge Beloff. Furthermore, the record reveals no possible constitutional claims based on pre-trial identification procedures or statements made by relator while in custody. Under these circumstances, it seems clear that in advising the guilty plea, Mr. Booker exhibited "normal competency." *Moore v. United States,* 432 F.2d 730, 737 (3d Cir. 1970).

■ Relator's argument does not stop here, however, for he contends that defense counsel's advice to plead guilty was based on inadequate preparation and a lack of knowledge about his case.[20] Re-

20. There is no late appointment of counsel problem involved here, such as in *United States ex rel. Taylor v. Rundle,* 456 F.2d 1245 (3d Cir. 1972). Here the Defender Association was in the case from the very beginning. *Moore v. United States,* 432 F.2d 730 (3d Cir. 1970), held that in the case of institutional representation of indigent de-

fendants by defender organizations, the timeliness of appointment must be measured by the time of the court's appointment of the organization and not by when individual staff members are assigned to perform their specialized duties. In the case at bar, the record shows that the Defender Association represented relator at least since the time of

lator argues that if counsel's advice is based on preparation which is palpably deficient when compared with normal competency, the plea can hardly be said to be an intelligent act done with sufficient awareness of the relevant circumtances and likely consequences. Assuming the logic of such an argument (which essentially contends that trial counsel's preparation prior to the entry of the plea was so inadequate that it fatally flawed the competency of the advice to plead guilty),[21] we do not find that the preparation (and performance) in this case fell below that standard of normal competency which must precede a knowing and intelligent plea. The ordinary standard for judging effective assistance of counsel was set out by the Third Circuit in *Moore v. United States*, 432 F.2d 730 (1970), which held that counsel's preparation and performance was to be measured against a standard of normal competency.[22] The standard does not vary whether an indigent is represented by an individual or an institution such as the Defender Association.

While this is not a "late appointment" case as such (*see* n. 20 *supra*), it is akin to those cases insofar as they generally concern adequacy of preparation. Thus,

in *Moore* itself, the Court stated that the question of late appointment necessarily involved a consideration of the time of the appointment in the light of "all the attendant circumstances, such as the gravity of the charge, the experience of appointed counsel, the extent of his knowledge and participation in similar cases, his opportunity for preparation and even what he may have been told by the defendant which may reduce the area of necessary preparation." 432 F.2d at 735. Moreover, the language of Judge Rosen in *United States v. Junne*, 458 F. 2d 1156, 1158 (3d Cir. 1972) is apposite:

In applying this [normal competency] standard, the time of appointment of counsel should not be seen *in vacuo,* but, rather should be viewed in light of all the "attendant circumstances" [citing *Moore,* 432 F.2d at 735]. Paramount among these circumstances are the preparation difficulties of a case and the experience of a particular lawyer.[23]

In case at bar, Mr. Booker first met relator on the day of relator's plea. He spent approximately thirty minutes in actual conversation with relator prior to the entry of relator's guilty plea before Judge Beloff. The case did not

his preliminary hearing. At that time, the Commonwealth's only witnesses, the two complainants, testified and were cross-examined. Relator discussed his case with the assistant defender at this time. Later, an investigator from the Defender Office interviewed him in the prison about his case. Relator's next contact with the Defender Association was on the morning of his trial, at which time he pleaded guilty. Under the circumstances of this case, it is clear that the ineffective assistance claim as it impinges on the intelligence of the guilty plea cannot be grounded upon late appointment of counsel.

21. See *United States ex rel. Johnson v. Russell*, 444 F.2d 1177, 1179 n.11 (3d Cir. 1971) : "It is conceivable that a situation might arise where inadequate preparation for trial by counsel may well fatally flaw the competency of the advice to plead guilty and thus constitute grounds for a new trial." See also *United States v. Johnson*, 495 F.2d 335, 342 (3d Cir. 1974) (Seitz, C. J., concurring).

22. In *Moore,* the Court of Appeals held :

[T]he standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place.

A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances.

432 F.2d at 736 (footnotes omitted).

23. In *Junne,* although counsel was not appointed until two days prior to the trial, the Court held that "in this comparatively simple case two days was adequate time for Junne's counsel to prepare his defense . . . ." 458 F.2d at 1158.

appear to be complex. No complicated issues of law or fact were involved. There were no pre-trial identification procedures (since both complainants knew relator), no physical evidence, and no statements; thus, no suppression issues. Additionally, Mr. Booker was an experienced trial attorney. Prior to relator's case, Mr. Booker had represented more than 500 criminal defendants over a period of twelve years. He was at the time in the Major Trial section of the Defender Association, where he predominantly handled rape and robbery cases.[24] The Defender Association had represented relator at least since the time of his preliminary hearing. An assistant defender had represented him at that hearing, where the Commonwealth's only witnesses, the two complainants, both testified and were cross-examined. Their testimony was essentially the same at that hearing as at the time of relator's guilty plea. These facts, as well as the report of an investigator's interview of relator while in prison were all a matter of record. At trial, Mr. Booker had the Defender Association's plus the District Attorney's file on the case. Moreover, Mr. Booker conferred with Mr. Killeen, the assistant defender originally assigned to relator's case, prior to informing the Court that there would be a plea.

■ Although counsel did not meet relator until the day of trial, relator has not met his burden of making a "showing of considerable actual prejudice, not mere fanciful or speculative prejudice." *United States ex rel. Davis v. Johnson*, 495 F.2d 335, 340 (3d Cir. 1974). Relator's claim that Mr. Killeen could have done a better job falls into the speculative category, particularly since relator had never met Killeen and was unaware of the extent of his preparation on the case. In any event, even if we were to assume that some other lawyer might have done a *better* job than Mr. Booker, that is not what we are concerned with

here. Unless Booker's preparation fell below that standard of normal competence, and we find that it did not, even under relator's argument the plea can hardly be said to be unintelligent.

The facts surrounding defense counsel's representation of relator are not unlike those which we found in *United States ex rel. Navarro v. Johnson*, 365 F.Supp. 676 (E.D.Pa.1973). In that case, trial counsel, a staff member of the Philadelphia Defender Association, did not personally meet his client "until the morning of trial, and he spoke to him only briefly (for about five minutes)." 365 F.Supp. at 688. Assessing all of the attendant circumstances as required by *Moore*, we concluded that where defense counsel had in his possession and had carefully reviewed the Defender Association file which contained, *inter alia*, the results of an interview with petitioner and a report by the Defender Association investigative staff of a conversation with one of petitioner's victims, the extent of preparation met the *Moore* normal competency standard. Although in *Navarro* trial counsel's review of the file was supplemented by his interview of the arresting officer, we do not find that such an interview was necessary here where Mr. Booker was given the District Attorney's file.

■ The only other inquiry regarding the ineffective assistance claim arises from our finding that Mr. Booker passively allowed Assistant District Attorney Bryant to approach and confer with his client, albeit in the presence of defense counsel. However, Mr. Bryant did not misrepresent the facts; he only "informed" relator of something we have found was not relayed to him by his own counsel or the court, and relator spoke to defense counsel thereafter. Moreover, relator does not claim that he relied on Mr. Bryant's representations in making his decision to plead guilty; for according to relator's testimony, such a conversation never even took place. Were the

24. Mr. Booker testified that in robbery cases of this nature he would usually speak to his client approximately twenty minutes to half an hour. N.T. 84.

conversation between Mr. Bryant and relator to have taken place out of the hearing of defense counsel and without any further opportunity for defense counsel to consult with his client prior to the entry of a plea, we might have been inclined to hold differently. See *Shupe v. Sigler,* 230 F.Supp. 601 (D.Neb. 1964).[25] We do not find that Mr. Booker's passivity in the face of Mr. Bryant's approach amounts to that lack of normal competency necessary to establish a finding of ineffective assistance of counsel.

D. *Was Relator's Guilty Plea Rendered Involuntary by the Prosecutor's Conduct at the Time of the Entry of the Plea?*

 Mr. Bryant has characterized his methods and approach to the prosecutorial function as "unorthodox." The Commonwealth, in its brief, concedes that Mr. Bryant's behavior was "undignified in the extreme and unbecoming to his office." Comm.Mem. of Law, at 8. We find his conduct shocking. However, this is not a disciplinary proceeding, but the review of the constitutional validity of relator's guilty plea.[26] Accordingly, even the grossest sort of prosecutorial misbehavior is irrelevant here, unless that misconduct coerced a plea which was not the free and informed choice of relator.[27]

 A guilty plea induced by promises or threats which deprive it of the character of a voluntary act is open to collateral attack. See *Shelton v. United States,* 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958), *rev'g* 246 F.2d 571 (5th Cir. 1957); *Waley v. Johnston,* 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942); *Walker v. Johnston,* 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830 (1941). The voluntariness of relator's plea can be determined only by considering all of the relevant circumstances surrounding it. *Brady v. United States,* 397 U.S. 742, 749, 90 S.Ct. 1463 (1970); *United States ex rel. Crosby v. Brierley,* 404 F.2d 790 (3d Cir. 1968).[28] While relator's statement in open court at the time of his plea that no promises or threats had been made to induce him to plead guilty is evidential on the issue of voluntariness, it does not foreclose further inquiry. See *Fontaine v. United States,* 411 U.S. 213, 93 S.Ct. 1451, 36 L.Ed.2d 1169 (1973); *United States v. Truglio,* 493 F.2d 574, 579 (4th Cir.

---

**25.** In *Shupe,* the court concluded that for a prosecuting attorney to talk with the defendant in the absence of his counsel and attempt to have him change a plea of not guilty to a plea of guilty and in the absence of counsel to reach an agreement as to the length of his sentence, whether made with or without authority of the court, was to deprive the defendant of the effective assistance of counsel at a time when it was needed.

**26.** Most cases dealing with prosecutorial misconduct arise in the context of direct review of the prosecutor's closing argument. However, even those cases hold that more than misbehavior is required. See, e. g., *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *United States v. Somers,* 496 F.2d 723 (3d Cir. 1974); *United States v. Trutenko,* 490 F.2d 678 (7th Cir. 1973); *United States v. Benson,* 487 F.2d 978 (3d Cir. 1973); *United States v. LeFevre,* 483 F.2d 477 (3d Cir. 1973).

**27.** In most cases, a well-counselled guilty plea waives prior constitutional infirmities in the prosecution. *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); but see *Lefkowitz v. Newsome,* 420 U.S. 293, 95 S. Ct. 886, 43 L.Ed.2d 196 (1975); *United States v. Zudick,* 523 F.2d 848 (3d Cir., 1975), at 851–52. The *McMann* trilogy, of course, does not interfere with our inquiry into the *voluntariness* of relator's plea as it may have been affected by contemporaneous (or even prior) impermissible conduct of the judge or prosecutor. See *Brady, supra,* 397 U.S. at 751 n.8, 90 S.Ct. 1463; *United States v. Jasper,* 481 F.2d 976, 982 (3d Cir. 1973).

**28.** Relator's factual guilt or innocence, of course, is irrelevant to the question whether relator's plea was voluntary. *Heideman v. United States,* 281 F.2d 805, 808 (8th Cir. 1960); *Friedman v. United States* 200 F.2d 690 (8th Cir. 1952); *United States ex rel. Bresnock v. Rundle,* 300 F.Supp. 264, 269 (E.D.Pa.1969).

1974); *Hilliard v. Beto,* 465 F.2d 829 (5th Cir. 1972); *Mosher v. LaVallee,* 351 F.Supp. 1101, 1107 (S.D.N.Y. 1972), *aff'd,* 491 F.2d 1346 (2d Cir.), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed. 2d 111 (1974); *United States ex rel. Perpiglia v. Rundle,* 221 F.Supp. 1003, 1006 (E.D.Pa.1963). Viewing the totality of the circumstances in this case, we do not find that Mr. Bryant's short conversation with relator destroyed the voluntariness of the plea. Regardless of Mr. Bryant's manner, which we find to be objectionable, what he said to relator was solely informational, and not coercive. Mr. Bryant did not threaten relator and did not even recommend any particular course of action; he left the choice to relator, and left him alone to confer with counsel. Accordingly, we find that the Bryant conversation did not vitiate relator's plea.

We find the language in *Brady v. United States,* 397 U.S. 742, 750, 90 S.Ct. 1463, 1470 (1970), to be apposite:

> The State to some degree encourages pleas of guilty at every important step in the criminal process. For some people, their breach of a State's law is alone sufficient reason for surrendering themselves and accepting punishment. For others, apprehension and charge, both threatening acts by the Government, jar them into admitting their guilt. In still other cases the post-indictment accumulation of evidence may convince the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family. All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas; the pleas are no more improperly compelled than is the decision by a defendant at the close of the State's evidence at trial that he must take the stand or face certain conviction.

It is true that the above language in *Brady* makes no reference to the situation where the prosecutor or judge, or both, deliberately employ the charging and sentencing powers to induce a particular defendant to tender a plea of guilty. Indeed, the court stated that in Brady's case there was "no claim that the prosecutor threatened prosecution on a charge not justified by the evidence or that the trial judge threatened Brady with a harsher sentence if convicted after a trial in order to induce him to plead guilty." *Id.* at 751 n. 8, 90 S.Ct. at 1470. The same, however, is true in relator's case. Mr. Bryant only stated to relator the maximum punishment that he could receive on the charges under which he had been indicted. Indeed, Mr. Bryant may well have underestimated the maximum sentence in light of the Commonwealth's representations that a maximum of eighty years could have been imposed. Not only did Mr. Bryant make no threats, but there is no evidence that Mr. Bryant promised a lesser sentence to relator in the event of a guilty plea. In fact, the record of the hearing before us clearly established that Mr. Bryant rejected any attempts at plea negotiation by defense counsel, preferring instead to "let the chips fall where they may." N.T. 43.

The decision in *Shupe v. Sigler,* 230 F.Supp. 601 (D.Neb.1964), relied upon by relator, is not inconsistent with the result we reach. In *Shupe* the court held that the petitioner's plea of guilty was induced by threats and promises and was, therefore, void. It was undisputed that the prosecutor had several conversations with Shupe in which he endeavored to persuade him that he had no defense and that he should plead guilty and save the prosecutor the trouble of a trial, and that he also bargained with Shupe as to the sentence to be imposed.[29] However, those conversa-

---

29. The prosecutor also testified that, during the course of these talks with Shupe out of the presence of his counsel, he told Shupe that if he pleaded not guilty he would be tried as an habitual criminal and face ten to twenty years rather than two to fifteen. Moreover, in discussing possible sentences the prosecutor indicated to Shupe to expect the worst in his sentence, given his record.

tions were not only qualitatively different from the one at bar, but they took place in the absence of counsel.

The notion of voluntariness is subtle. As Judge Weinfeld noted in *United States v. Colson*, 230 F.Supp. 953, 955 (S.D.N.Y.1964):

> The determination of the ultimate question of whether the defendant, at the time he pled guilty, had the free will essential to a reasoned choice, rests upon probabilities and, of course, cannot be resolved with mathematical certainty. It involves an evaluation of psychological and other factors that may reasonably be calculated to influence the human mind.

This concept has been employed to analyze a variety of pressures to surrender constitutional rights which are not obvious in their coercive effect. Nevertheless, under the circumstances of this case, we do not find that involuntary surrender of any sort occurred. We do not find that the tactics of Mr. Bryant exerted so great an influence upon relator, or that his will was so overborne or completely dominated, that he was incapable of rationally weighing the legal alternatives open to him. Nor do we find that the prosecutor unfairly burdened or intruded upon the relator's decision making process by making impermissible threats or unkept promises of leniency. Accordingly, we hold that relator's plea was not involuntarily entered.

In consideration of the foregoing opinion, we enter the following order denying the writ. There is probable cause for appeal.